## Coats v. Commonwealth.

(Decided May 17, 1921.)

### Appeal from Grayson Circuit Court.

1. Criminal Law—In Custody of Officer—Evidence—Sweating.— Where one is in custody of an officer, and without coercion, threat or promise from the officer, or persistent or improper questioning from him, but in response to questions from the officer, voluntarily makes a statement as to how a difficulty in which he had been engaged occurred, the statement is competent evidence against him, and is not in conflict with our anti-sweating act.

2. Criminal Law—Use of Passway—Instruction Involving Title.—In a personal difficulty growing out of the right to use a passway, no instruction should be given involving the title to or right to the use of the passway.

3. Criminal Law—Evidence as to Rights in Passway.—On such a trial the evidence of the parties as to their rights in the passway is admissible only for the purpose of putting the jury in the situation of the parties and enabling it to determine their motives and understand their action.

4.   Criminal Law—Right of Father to Defend Son—Instructions.—
     Ordinarily a father engaged in a personal difficulty against others,
     in which his son is also engaged, is entitled to an instruction giv-
     ing him the right to defend his son; but where the father did not
     know that his son was present at the time of the difficulty, and
     did not see him there, and consequently did not know he was in
     any danger, he had no right to such an instruction.

Z. T. PROCTOR and H. L. JAMES for appellant.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, As-
sistant Attorney General, and HENRY DeHAVEN MOORMAN for
appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—
Affirming.

The appellant, W. H. Coats, and his son, Lawrence
Coats, were jointly indicted, charged with the murder of
Alex Harris.

Upon their joint trial Lawrence Coats was acquitted,
but appellant was found guilty of voluntary manslaughter
and sentenced to twelve years' imprisonment.

His motion and grounds for a new trial were over-
ruled, and he has appealed.

The admitted facts are, that some time prior to the
day of the homicide W. H. Coats and Alex Harris had a
difficulty about the right of Harris and his family to the
use of a certain passway or right of way across the lands
of Coats, and that on the day of the homicide they had
each, together with some members of the family of each,
been to the county seat to attend a trial wherein Coats
was charged with a breach of the peace growing out of
the difficulty with Harris. On the trial Coats was ac-
quitted, and in the afternoon of that day Harris and his
party left the county seat before Coats and his party did,
but the Harris party stopped on the road at the home of
a relative named Deweese and there took a late afternoon
dinner. While they were at the home of Deweese, which
was near the road where Coats' party had to pass, they
passed and were observed by at least some of the mem-
bers of the Harris party, and the Coats party reached
home before the Harris party left the home of Deweese.

Coats, upon reaching his home, unloaded from his
wagon some groceries and other things which he had pur-
chased and then got his double-barrel shotgun and an-
nounced his purpose of going to another part of the farm
to feed the hogs, but abandoned this immediate intention

because of a suggestion by his wife that she would go with him if he would wait until after supper. He then put down his shotgun against the fence in the yard and proceeded to do some other things. About that time he was notified by some member of his family that the Harrises were coming up the disputed passway from the direction of the Deweese home. His son Lawrence was at the time at the barn, some little distance away. Upon receiving this information he took his shotgun and, accompanied or followed by two or three of his daughters, started toward the passway or road so as to intercept the Harris party, and, as he says, for the purpose of telling them again that they were not to use the passway. The son Lawrence, being at the barn, also started toward the passway, probably along a different route from that taken by his father. At any rate, appellant testifies that he did not know his son was at the place of the difficulty until after it was over.

The parties met in the passway, and from that time on the evidence as to what occurred is very contradictory.

The Harris party consisted of Alex Harris and two of his young grandsons, and his daughter-in-law and two or three other smaller children. One of the young grandsons, as all of the Harrises say, was leading a mule, and another carrying a single-barrel shotgun, while Harris himself was on horseback and unarmed and all other members of the party walking.

The deceased, Alex Harris, was 75 years of age, while appellant was 46, and the evidence fails to show that Harris dismounted from his horse at any time during the difficulty, but shows that after being shot he fell therefrom and shortly died.

The difficulty began at a point on the road about 25 or 30 yards from a sharp turn therein going towards the house of Harris, and the point where Harris fell from his horse was after he had made that turn going towards his home.

The evidence for the Commonwealth, in substance, is that when he came to the road or passway and intercepted the Harris party, appellant said to the daughter-in-law, whose name was Lucy: "Lucy, you and the children step aside!" and then said to Alex Harris and Ernest the elder grandson, "Alex, you and Ernest stop!" and that appellant then immediately shot at Ernest Harris, who in the meantime had taken from his younger brother, John, a single-barrel shotgun, and that appel-

lant, after so shooting at Ernest, turned a little bit and
shot at Alex Harris, who was on the horse; that Ernest
Harris, after appellant had shot twice and was reloading
his gun, shot at appellant and struck him in the shoulder,
and then turned around and ran back in the direction
whence he had come; that appellant, having reloaded his
gun, then started after Ernest and shot at him again, but
abandoning the chase after Ernest, he turned back and
followed the old man, who was on the horse and who had
turned the corner in the road, and shot him twice after he
had passed the corner and at about the point where his
body was found; that Lawrence Coats was present dur-
ing the difficulty and had a pistol and fired some several
shots from it; that the deceased was shot on the inside of
his right leg, whereby one of the large arteries was sev-
ered, from which he died.

It appears also that Lawrence Coats was shot during
the difficulty, and the evidence for the Commonwealth
tends to show that at the time appellant was shot, Law-
rence was standing behind him and on higher ground,
and that the same shot which struck appellant in the
shoulder also struck Lawrence in the leg.

On the contrary, the evidence for the appellant shows
that when he reached the road he said to them that he did
not want them to use that road any more, and that Ernest
Harris, who in the meantime had taken the shotgun from
John, immediately opened fire on him and wounded him
in the shoulder, and that Ernest Harris fired some four
or five shots, and that appellant fired only two shots and
both of them at Ernest Harris; that Lawrence Coats did
not have a pistol on that occasion and did not fire a shot,
and the evidence for the defendant tended to show, that
the shot fired by Ernest, and which struck appellant in the
shoulder, was the shot which struck and killed Alex Har-
ris.    The appellant states that, when he reached the road
and notified the party that they must not use that pass-
way any more, Alex Harris, who was leading the Harris
party on horseback, said, in substance, that he had start-
ed and he was going, and rode around appellant and left
him (appellant) facing Ernest Harris, who had the
single-barrel shotgun, and that when Alex Harris rode
around and got behind appellant, and Ernest Harris shot
appellant in the shoulder the deceased was in direct line
behind appellant and must have been shot by the same
shot which struck him in the shoulder.    Appellant's own
evidence, and that of the members of his family present,

is that he never fired a shot at any time at Alex Harris, and that Ernest Harris shot some three or four times, and shot one or more times at Lawrence Coats.

On the night of the homicide the sheriff, McCabe, with several others went to the place of the difficulty and there found the body of Harris. Desiring to remove the body to the home of deceased, it became necessary for them to get a blanket in which to handle the body, and with that purpose in view they went to the nearby residence of appellant and there the sheriff had a conversation with appellant with reference to how the difficulty occurred, and on the trial the sheriff was permitted to state that in response to a question from him, the appellant stated to him that Mr. Harris was coming towards him with his hand on his hip when he shot him.

If this evidence given by the sheriff was incompetent because in conflict with our statute known as the anti-sweating act, it was prejudicial to appellant's substantial rights, for, as will be seen from our statement of appellant's evidence, it was totally inconsistent with the theory of appellant's defense as presented at the trial. His defense on the trial, in substance, was that he did not shoot, or shoot at, the deceased, and the evidence of the sheriff of his statement on that night is wholly inconsistent with that view.

The statement of the sheriff is, in substance, that this statement was made to him by appellant before he had been placed under arrest, although he admits that he then had in his pocket a warrant for his arrest and had primarily gone to that locality for the purpose of arresting him, and that, before he left appellant's house to return to the place where the body was, there was an understanding or agreement that appellant was to dress and be ready to accompany him upon his return to the house, and from these considerations there is much discussion in the briefs as to whether appellant was at the time technically under arrest. But in our view of the case, and in the light of a recent opinion on the subject, it is immaterial for the purposes of this case whether appellant was or was not at the time under arrest.

There is nothing in the evidence to show, or from which any fair inference may be drawn, that the sheriff used any coercion, or threat, or promise, or inducement, which resulted in this declaration by the appellant, or that the statement was elicited from appellant by any persistent and improper questioning by the officer or

others; on the contrary, it shows that he, without hesitation, voluntarily made the statement to the sheriff, without dictation, or coercion, or inducement, offered by the sheriff or any one else.

The case of Com. v. Harris, 177 Ky. 607, was where the defendant, after his arrest, and while in the custody of the officer, and in response to questions from the officer, made certain statements, the introduction of which was objected to on his trial, and the court pointed out that such voluntary statements, made without coercion or dictation from, or inducement offered by the officer, were competent evidence against the defendant, and we are constrained to follow that ruling in this case.

It is likewise contended that the court should have in its instructions told the jury that the defendant had the right to expel Harris from his premises, or should have submitted to the jury the question of Harris' right to the use of the passway.

Manifestly no such question should have been submitted to the jury; such an instruction would have involved the title to, or at least the right to the use of land, and would have been in effect submitting to the jury a collateral issue which might have, and probably would have distracted the attention of the jury from the real issue, and might have induced the jury to believe that a landowner had the right, in ejecting a tresspasser from his premises, to shoot and kill him.

The case of Utterback v. Com., 105 Ky. 723, was a homicide case growing out of conflicting claims as to the use of a passway, and the court, in considering this same question, expressly held that life may not be taken to prevent a trespass, but said that the question in such a case was always whether the defendant acted in self-defense, or in necessary defense of others, and that the rights of the parties to the land or passway in question could only be tried in a civil suit; that the evidence of their respective claims in a homicide trial was admissible only for the purpose of putting the jury in the situation of the parties and enabling the jurors to determine the motives of the parties and to understand intelligently their action. Stacey v. Com. 189 Ky. 402.

The contention that the instruction on self-defense was so worded as to deprive the defendant of the right to act on the danger, or apparent danger as it appeared to him, is not in accord with the facts. On the contrary, the instruction given expressly provides that, if the de-

fendant believed, and had reasonable grounds to believe, he was then and there in danger at the hands of the deceased or Ernest Harris, and that it was necessary, or believed by the defendant in the exercise of a reasonable judgment to be necessary, to shoot at either of them in order to avert the danger, or to him apparent danger, then he should be acquitted.

It is also said that appellant was entitled to an instruction directing the jury to acquit him if he shot in defense of his son Lawrence.

Ordinarily this would be true of course, but in this case it appears from the evidence of the defendant himself that he did not know at the time of the difficulty that his son Lawrence was there but thought he was at the barn, and did not see him present at the difficulty at all.

It takes no argument, of course, to show that if he did not know his son was in danger, he had no right to shoot to avert such danger.

Upon the whole case, it appears appellant has had a fair trial, and the judgment is therefore affirmed.