## Cornett v. Commonwealth.

(Decided October 23, 1931.)

D. M. BINGHAM and M. G. COLSON for appellant.

J. W. CAMMACK, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On the late afternoon of May 10, 1930, the appellant and defendant below, William Cornett, shot and killed Clark Warren with a shotgun. The killing occurred on a railroad track immediately in front of a building, in the front part of which deceased operated a small merchandise business, and in the rear of which he and his family resided. Some time thereafter defendant was indicted by the grand jury of Bell county, charged with murder, and on his trial he was convicted and punished by life confinement in the penitentiary. On this appeal from the verdict, and judgment pronounced thereon, his counsel argues that the court erred in refusing a new trial: (1) Because the verdict is flagrantly against the evidence, (2) in the admission of evidence offered by the commonwealth, and (3) in failing to properly instruct the jury, each of which will be considered and determined in the order named.

■ The disposition of argument 1 requires an abridged statement of the substantial facts proven at the trial. Defendant was and is a bachelor and was about 73 years of age at the time he killed deceased. He was a miner by trade and had worked at it for thirty or forty years. The deceased was about 38 years of age, was married, and had two or three children, the oldest of whom was about 9 years of age. He had in the past, to some extent, engaged in digging coal as a miner, but at the time of the killing, and for some considerable period prior thereto, he was operating a small mine designated in the record as a "wagon mine," under a lease that he had obtained from a landowner. In connection therewith he also conducted a small retail store. The evidence discloses without contradiction that deceased was in possession of a small undescribed amount of household goods and effects belonging to defendant, and the latter was proven to have made

threats that unless deceased relinquished that property and turned it over to defendant that he (deceased) would be killed. The facts with reference to why the deceased held that property are not testified to, but it is intimated that it was to satisfy some lien to secure a debt owed to deceased by defendant and, perhaps, for rent; but there is no proof to substantiate such surmise, although the fact that deceased held the property claimed by defendant and that the latter had made threats of the nature indicated are testified to.

On the forenoon of the fatal day, defendant, who lived about three-fourths of a mile in one direction from where the killing occurred, borrowed a mule from Mart Nance, who lived about a mile from deceased in the opposite direction, for the purpose of preparing and planting his garden. Somewhere near 12 o'clock defendant carried the mule to Mr. Nance, traveling what the witnesses designated as "the tram road" and being a fraction farther than the route between the same points by way of the railroad track, and which latter, according to the undisputed testimony, was frequently used by horseback riders. In returning the mule defendant carried with him his shotgun, well supplied with shells. There is a dispute in the testimony as to the length of time defendant remained at the home of Mr. Nance on that trip, some of the witnesses saying that he departed therefrom at about 1 o'clock p. m., while others say it was as late as 4 o'clock. At any rate, in returning he traveled the railroad track, and just as he was passing the store and residence of the deceased the latter, with his wife and their oldest child, were emerging from the rear of that building which was the part occupied by them as a residence. They had started to the home of the brother of the deceased to get a younger child, who was at the home of its uncle, and bring it home. Just as deceased and his wife and child were entering upon the railroad track to cross it and travel the dirt road to the home of his brother, defendant was passing along the railroad track with his gun.

What then happened is thus told by the widow, who testified for the commonwealth: "He (deceased) was coming up the bank and Mr. Cornett he was coming up and had his gun in his hand, said, 'Mr. Warren a man told me this morning that you said you was going to kick me all over this road.' Mr. Warren said, 'Who

told you that?' He said, 'It was a man told me, it was a man told me,' just kept saying that. Mr. Warren said, 'Nobody will not come to me and tell me I said I would kick you all over the road,' said, 'Who was it?' Mr. Cornett said, 'It was a man.' By that time he threw that gun on him from his waist down. Mr. Warren' said, 'Go on up the road and leave me alone, you have stopped me here and raised a racket and me in my own possessions.' . . . I said, 'Come on, Mr. Warren, let's go' and he turned his back to Mr. Cornett and was coming in the direction of where I was up the dirt road, the road we had to take our mules down. We walked about two steps and old man Cornett shot him in the back.'' The 9-year-old son of the deceased, who was also an eyewitness to the killing, substantially corroborated the testimony of his mother, and the undisputed proof in the case, including an admission by defendant, was that deceased was shot in the back from his rear and from a distance of between six to twelve feet. There was no other wound upon his body indicating that the shot was fired from any other direction than from behind him. The shots were No. 5 and there were ninety-odd punctures of the body of the deceased with that many separate shots.

On the other hand, defendant testified that he carried his gun along when he returned the mule to Mr Nance for the purpose of pledging it to the latter to secure him in about 50 cents worth of garden seed he intended to buy from Nance, but that the latter had no garden seed and defendant concluded to and did return with his gun. He was asked why he had loaded the gun and had carried along other shells, and he stated that he expected to kill a rabbit, although the season for hunting rabbits was not open at that time. He told about deceased and his wife and the little boy coming out of their residence, and upon the railroad track, as defendant was passing, and then testified:

"He (deceased) asked me did I have that gun for to kill him with, I told him no sir, I didn't have anything against him, he said God damn I will have something against you if I can get hold of that gun, I backed off and surrounded him and got in the middle of the track back on the right of way, he kept his hand in his left front pocket all the time. . . .

When he came out I surrounded him and told him I didn't want no trouble with him, I didn't have anything against him, and haven't got anything against you now. He said God damn you run, run, run.

"Q. How far did he get the pistol out? A. Just kind of the butt out of his pocket.

"Q. You saw that? A. Yes, sir, I did.

"Q. Did you see any knife? A. No, sir, didn't see no knife.

"Q. Then what did you do? A. I went on, I kept walking, he kept on on one end of the track me on the other. I was in front of him, he kept hollering run, run, he got up fernenst the upper corner of his house, he was still hollering and his wife hollered and told me to run; he whirled to go to his side like that and jerked his pistol and when I saw the butt of the pistol come out of his pocket I made for my gun, up like that.

"Q. And shot him? A. Yes, sir.

"Q. Where did you hit him at? A. I hit him mostly in the side there, kindly a little bit in the back; he throwed his side to me as he went to jerk his pistol."

He then pursued his journey along the railroad, and somewhere near his home, which, was a distance of a mile or less from the scene of the homicide, he came upon a crowd of which the deputy sheriff, Ballinger Howard, was a member and surrendered himself. In doing so (according to the testimony of the sheriff and a number of others who were present) this occurred: "He come up, walked up in the crowd and asked if I was in the crowd. I stepped up and said yes, he reached me his gun and said I want to give up. I said what have you done, he said I killed Clark Warren a while ago; I said, probably you didn't, yes he said, I think I did. . . . He just showed me where he shot him at, said he shot him right behind the shoulder somewhere." To others he stated on the same occasion that he shot deceased at about the "cross of his gallouses." It was uncontradictedly proven that deceased was in his shirt sleeves at the time he was killed and had no pistol, but did have a small pocketknife which was unopened when he was killed, and the two eyewitnesses to the tragedy positively stated that he had no knife or other weapon, or anything at all, in his hands at the time he was shot.

Some witnesses testified that the reputation of deceased for peace and quietude was bad, while an equal number or more testified that it was good, and it was shown that those who impeached his character in that regard entertained ill feeling towards him. Witnesses pro and con were also introduced as affecting defendant's reputation, and in their examination it was developed that he had previously committed and was convicted of two other distinct homicides, and perhaps three, and that he had been paroled or pardoned in each case. From a recitation of the facts as above outlined, it is patent that this argument is without merit and cannot be sustained.

■ The complaint made in argument 2 is directed to the testimony given by the deputy sheriff and those who were present on that occasion, upon the alleged ground that it was obtained from defendant in violation of what is known as our "anti-sweating" statute, as is contained in sections 1649b-1 to and including 1649b-4, Kentucky Statutes. The statute has often been before this court for interpretation and application, and it has been uniformly held that a voluntary admission or confession by a defendant (and especially if made shortly after the commission of the crime) was admissible against him and was not denounced by the statute. Some of the numerous cases so holding are: Helm v. Commonwealth, 156 Ky. 751, 162 S. W. 94; Wellington v. Commonwealth, 158 Ky. 161, 164 S. W. 333; Garrison v. Commonwealth, 169 Ky. 188, 183 S. W. 473; Ratliff v. Commonwealth, 182 Ky. 246, 206 S. W. 497; Coats v. Commonwealth, 191 Ky. 521, 230 S. W. 947; Dials v. Commonwealth, 192 Ky. 440, 233 S. W. 888; Boyd v. Commonwealth, 194 Ky. 73, 238 S. W. 182. Others are referred to in those opinions; and this court has continuously since then followed the interpretation therein announced. In this case there was no "sweating" of defendant as contemplated by the statute. But one or more questions were propounded to him, each and all of which were suggested by the statement he voluntarily made when he surrendered himself. Besides, the most damaging statements made by and proven against defendant were in response to questions propounded to him by others who were present and who were not officers or participated in any manner in the surrender. There is nothing in this case bringing it within the condemna-

tion of the anti-sweating statute and for which reason this argument is unavailable.

■ The only complaint made in argument 3 is that inasmuch as the admissions just discussed were proven against defendant, the court erred in not instructing the jury under the provisions of section 240 of the Criminal Code of Practice, saying: "A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied with other proof that such an offense was committed." The fallacy contained in this argument lies in the fact that the proven confession, if it should be so characterized, was "accompanied with other proof that such an offense was committed." The "confession" dealt with by the section of the Criminal Code is an admission by defendant that he perpetrated the crime, or the acts which the commonwealth seeks to construe into a crime, and does not relate to the reasons why he did so. Therefore, the only portion of the statements made by defendant to the sheriff and others who were present that could be characterized as a confession, within the contemplation of the Code, was the fact that he had shot and killed Clark Warren. That fact had already been proven by two other witnesses, Mrs. Warren and her 9-year-old son, and defendant made the same confession at his trial in testifying in his own behalf.

In subsection 9 of the notes to section 240, supra, of the Criminal Code of Practice as appearing in the 1927 Edition of Carroll's Kentucky Codes, there are cited a number of cases from this court holding that where a confession made out of court is accompanied by other proof, independent of the confession, that the crime has been committed, the court is then not required to instruct under the section; nor is it necessary to so instrust the jury when the defendant testified at his trial in his own behalf and made the same confession. See Ratliff case, supra; Dunbar v. Commonwealth, 192 Ky. 263, 232 S. W. 655, and other cases cited in the notes to the section of the Criminal Code referred to.

The evidence in this case largely preponderates in support of the conviction that the killing of deceased by defendant was wholly without legal excuse, and the jury were abundantly justified in so concluding.

No prejudicial errors appear in the record, and the judgment should be, and it is affirmed.