## James Smith and Charles Smith v. Commonwealth.

(Decided April 26, 1912.)

### Appeal from Mason Circuit Court.

1.  Murder—Evidence.—Upon the trial of appellants charged with the murder of an unknown negro, the evidence examined and held that the whole record discloses an undoubted, cold blooded, wanton and most shameless murder.

2.  Murder—Application for Change of Venue—Evidence—Discretion

of Court.—Where the deceased was a vagrant negro, unknown and friendless, whose manner of life and few short hours could have awakened no sympathy for his life, and no resentment against its ending, and the evidence further showing there was no general public sentiment about the matter, and no prejudice against the accused negroes, sufficient in any wise, to prevent an impartial trial, the motion of appellants for a change of venue was properly overruled.

3. The granting or refusing of a change of venue is within the sound discretion of the trial judge, and the exercise of such discretion will not be reviewed unless the record leads to the belief that such discretion was abused below.

4. Murder—Accomplices—Evidence.—It is erroneously assumed by appellant's counsel that the women who testified were accomplices. The fact that they were so indicted does not make them so. But the testimony of the women is corroborated to the fullest degree demanded by the statute, and the conviction of appellants upon this feature is without error.

5. Murder—Instructions—Not Necessary to Write Whole Law into Every Instruction.—It is unnecessary to write the whole of the law into every instruction. It suffices that the intent and meaning of the trial court be clearly apparent to, and comprehended by the jury.

6. Instruction.—If in a reasonably intelligible way to a reasonably intelligent mind, the court has given the whole law in a criminal trial, this court will not reverse for narrow, technical or linguistic complaints.

FRANK P. O'DONNELL and HENRY L. WOODS for appellants.

JAMES GARNETT, Attorney General and M. M. LOGAN, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE WINN—Affirming.

The appellants, standing under a sentence of death imposed by a jury verdict and judgment in the Mason Circuit Court, appeal here. On Sunday, July 9th, 1911, the dead body of a negro man was found on the side of the sloping bank of a cut on the L. & N. Railroad track adjacent to the city limits of Maysville, Kentucky. The negro was a stranger in the community. No one in Maysville seems to have known him and, so far as the record discloses, no one there seems ever to have seen him prior to Friday, the 7th of July, immediately preceding the Sunday upon which his dead body was found. His identity was still not fixed at the time of the trial of the appellants, who were indicted for his murder.

The negro, sometimes spoken of in the record as

"Ed," a name given him by the appellants, is, so far as the record discloses, first seen in Maysville on Friday afternoon, the 7th of July. A pool-room attendant testified that between five and six o'clock, on Friday, the appellants and a third negro, a stranger in town, came into the pool-room and played a game of pool. M. J. Donovan, a saloon keeper, testified that something after eight o'clock, on Friday evening, the two Smiths and an unknown negro man came into his place of business; that the strange negro bought a case of Wiedeman beer, for which he paid $2.25; that he had some bills in his hand; that Charles Smith said they were going up the railroad a piece and that he would return the beer case, but that he did not do so; that James Smith bought a dime's worth of ice; that his clerk waited on them in his presence; that they left, Charles Smith taking the case of beer on his shoulder and James Smith taking the ice; that he saw the dead body after it was found, and that it was the body of the man who was in his place with the appellants. Riley Ishmael, the clerk, testified as to the purchase of the case of beer by the stranger; the purchase of the ice by James Smith; and that he, the clerk, wrapped the ice in an Enquirer. John Archdeacon testified that he was at the L. & N. station on Friday night and saw the Smiths and another man go up the L. & N. track past the station; that the tall Smith boy had the beer case on his shoulder. John Russell testified that he saw Charles Smith going up the L. & N. track with a case of beer on his shoulder. Ed Gordon and Wat Whaley testified that they saw the Smiths and a stranger go by the L. & N. station on Friday night; that Charles had the case of beer and that the strange negro was with James Smith. Henry Mockabee testified that he lived near the railroad, out beyond the station; that he saw the Smiths pass his house on the railroad on Friday night; that they seemed to be carrying something; that there were a man and woman with them. Charles Cooper testified that he saw the Smiths on Friday night on Williams Drug Store corner; that with them were a stranger and a woman named Hattie Dempsey; that two other women, Nannie Cooper and Essie Price, were with the party on the drug store corner, and that they all talked there; that he saw the body of the dead man on Sunday and that it was the same man that he had seen in the party at the drug store corner on Fri-

day night. John Wright testified that he saw the Smiths and the strange negro come out of Donovan's saloon on Friday night; that Charles Smith had a case of beer; that the three of them went toward the L. & N. station; that he saw the dead man and thought it was the same man that he had seen with the Smiths. Walter Stockden and Elzie Edwards testified that they were taking a walk up toward the railroad on Sunday morning and found the dead body; that they called to Dr. Page, who was near, telling him of the finding of the body. Stockden testified that the weeds were mashed down where the body had been dragged from the top of the cut down the slope of the bank; that he saw the stick which was exhibited on the trial, and a blue handkerchief lying on the ground and three or four broken beer bottles and a beer case. Edwards testified that he saw the big club, some broken beer bottles and the beer case. Dr. Page testified that Stockden called to him about the finding of the body and that he telephoned to Higgins, the undertaker, to get Slack, the Coroner, and come out to the place; that the weeds were mashed down where the body had been dragged; that the club and handkerchief and an empty purse were found; that there was blood on the club and a bloody spot on the ground twenty feet from where the body was found. Charles Slack, the Coroner, testified about going out to the body on Sunday; that there was blood on the side of the dead man's face; that the weeds were mashed down; that twenty feet up the slope from the body he found the club with blood on it; that the handkerchief was found between the club and the beer bottles; that the bottles were near the club; that there was a little dark or blood spot on the ground; that he found the beer case some fifty feet from the club; that there was considerable blood on the grass and weeds and an old empty purse lying by the dead body; that there were gashed places on the right side of the dead man's head and that on the left the skull was "crushed completely in." Thomas Higgins, the undertaken, testified that he went out with the Coroner; that he found the club, the broken beer bottles, the handkerchief, the beer case and the empty purse; that the beer case was a Wiedeman case. Mike Brown, a deputy sheriff, testified that he found an Enquirer on the ground at the place. Dr. A. R. Quigley testified that he examined the dead body and found a wound on the right side of the face, and a depressed

fracture of the skull on the left side, which latter wound was necessarily fatal unless it should receive attention.

Indicted with the Smiths were the three women above named, Nannie Cooper, Essie Price and Hattie Dempsey, dissolute negro women of the town. Inasmuch as some question is made in the record about corroboration we have detailed at length the testimony of the foregoing witnesses, all independent of any testimony by the women. We now proceed to give their version of the matter.

Nannie Cooper testified that she, the Price woman and the two Smiths were berrying on reservoir hill on Friday morning; that she and the Price woman went down the street on Friday night and saw the Smiths and the man Ed at Williams Drug Store corner; that Hattie Dempsey came up; that Charles Smith "hunched" the witness and called Hattie "Belle;" that he called the witness "Luella" and the Price woman "Sarah Ella;" that it was there arranged that they should all go out for a good time; that the men left and got the case of beer, and that the men and women reconvened on the L. & N. out beyond the station; that they went on out the L. & N. track and finally stopped at the place where the killing was done; that there they sat around drinking and singing for a time; when the man Ed and Hattie went away together for some twenty minutes; that Charles remarked that "this son-of-a-bitch has $35 on him. * * * God damn it, we are going to have it, if we have to knock him in the head," and that if they got the money they would take the women up into Virginia; that she, the witness, remonstrated with Charles; that Charles said that he had the club ready and that if the women made any disturbance when he hit the son-of-a-bitch he would murder them; that Jim Smith said that he was going to do the hitting himself; that Ed and Hattie returned, when Ed sat down upon the case of beer beside Jim at Jim's invitation; that Charles Smith raised up behind Ed with the club and struck him on the side of the head; that Ed fell, when Charles said: "Hit the son-of-a-bitch; he ain't dead," and that Jim struck him again on the head; that the witness then fainted; that the women went further up on the bank and Charles brought the beer case up next to them; that the remainder of the beer was divided out between them; that they said that they were going to put the dead man out of the way where he wouldn't be found for a day or two;

that Charles added that there were but five of them there; that he would murder the first one who told it if it took a hundred years; that Charles said that "that son-of-a-bitch didn't have but $1.30 in his pocket," and that the party then left. She identified the club exhibited upon the trial, and the handkerchief found upon the ground as one which she had given to Charles Smith. Essie Price corroborates the witness, Nannie Cooper, as to the berrying on the hill on Friday morning, the meeting at the drug store corner on Friday night, the giving of the assumed names, the presence of the strange negro, the separation, the purchase of the beer, the trip out the railroad track, the drinking of the beer there, the separation of the stranger and the woman Hattie from the rest of the party, the remark by Charles Smith as to the man's having $35 on him and his purpose to get it. She then says that she remonstrated, and that Jim Smith said to her to shut up, and that if she told about it he would kill her as he was going to kill the stranger; that upon Ed's return he sat down on the beer case with Jim; that Jim leaned forward and that Charles struck him with the club, which the witness identified; that the man fell forward without any outcry; that Charles said: "Strike the son-of-a-bitch; he ain't dead yet," and that Jim took the club and struck him; that they both struck him then with beer bottles; that Charles took the man by the arm and Jim took him by the leg and they dragged him over the fence; that Charles said that he only got $1.35; that the beer was then divided up among the parties and they then went home. Hattie Dempsey, in substance, corroborated the other two women; but, perhaps out of some sense of shame, she says that she did not go away with Ed save that they went up as far as a telephone pole. She adds that after Charles struck the man and he fell James jumped to go in his pocket, when the man struggled, and that it was then that Charles said to hit him again. Beyond the introduction of a note or two passing between the men and women in jail this was all the testimony offered by the Commonwealth. At its conclusion the defense asked a peremptory instruction, which was refused. The appellant, James Smith, then took the stand for the defense. He testified as to the purchase of the case of beer; that the witness, his brother Charles, and the strange man called Ed, together with the three women, went out on the railroad to the point where the killing occurred; that his brother,

Charles Smith, struck the stranger on the head one lick with the club; that the witness had nothing to do with it and did not go through his pockets; but that he did, at his brother's request, help move the dead body over into the high grass. The witness said that Nannie Cooper and Essie Price hit the stranger with the beer bottles. He endeavors to say that Ed "looked mad" and that he had a mad frown on him. He was asked whether Ed made any attempt to pull a gun, when he answered: "He put his hand in his shirt, shirt was open. What he had I don't know;" but inasmuch as the witness testifies that up until just before the blow was struck everybody seemed to be upon good terms it is wholly obvious that the little effort to becloud the facts with some claim of self-defense is without foundation to support it. The whole record discloses an undoubted, cold-blooded, wanton and most shameful murder.

With the facts before us it is now our duty to search the record to ascertain whether any error prejudicial to the substantial rights of the parties was permitted during the trial. We will discuss the complaints in the order in which they are brought forward by appellants' counsel.

It is first argued that the motion of the defendants for a change of venue was erroneously overruled. In support of their motion they filed a number of affidavits. They likewise put in the record several articles theretofore appearing in the Maysville press, calculated to excite the public temper against them. Upon the other hand, the record discloses an answering statement published in the same papers, prepared and signed by the attorney appointed by the court to defend these negroes, which vigorously assails the negro women witnesses above named, and which, no doubt, affected the public temper quite as much as did the unfavorable articles which it answered. In addition, it is to be remembered that the dead man was a total stranger in Maysville. No friend or kinsman ever appeared to aid the prosecution. Frequently some white influence, born of the past relation of master and servant, or of family ties come down from the days of slavery, appears in a case like this, and prosecutes, out of some affectionate memory for the decedent; but it was not present here. The dead man was a vagrant, unknown and friendless negro, whose manner of life the few short hours of which are exhibited to us, could have awakened no sympathy for

his life, nor any intensely indignant resentment against the manner of its ending. That there was no general public sentiment about the matter, and no prejudice against the accused negroes sufficient in anywise to prevent an impartial trial, was testified to by two bankers, five magistrates of Mason County, its road and assistant road supervisor, a member of the council, a liveryman, an ex-jailer, and several farmers. Their testimony is intelligent and clear, and their opinion is pronounced that there was little, if any, feeling about the case, and that a fair trial was undoubtedly to be had in Mason County. The granting or refusing of a change of venue is within the sound discretion of the trial judge. The exercise of such a discretion will not be reviewed here unless the record presented leads us to believe that such discretion was abused below. Crockett v. Commonwealth, 100 Ky., 382; Greer v. Commonwealth, 111 Ky., 93; McElwain v. Commonwealth, 146 Ky., 104. Our system of criminal jurisprudence, an ancient inheritance, carried into our criminal code of procedure, fixes the place of the crime as the place of the trial, subject only to the right of the accused to show, if he can, such a state of public feeling against his suspected act, or against him, as would prevent his securing that impartial trial which the Commonwealth concedes to, and demands for, her citizens accused of crime. In our judgment no such showing was made by these defendants; nor did the trial court unwisely or improperly exercise its discretion.

It is next argued for appellants that the evidence fails to show, beyond a reasonable doubt, the corpus delicti, which "means the fact that a crime has been committed by some one; and in murder has two components —death as the result, and the criminal agency of another as the means." (Robinson's Criminal Law, volume 1, page 187.) It is seriously argued that as the physician says the wound on the left side was sufficient to cause death "if it did not receive attention," the death was caused, not by the wound, but as "the result of negligence in failing to give the injuries proper attention"—i. e., after the man's skull had been crushed in, and he had been dragged into the weeds to die, his own negligence in failing to obtain surgical attention caused his death. The argument does not appeal to us. In addition, the Coroner said his head was "crushed

completely in," which would seem to be satisfactory proof of "death as the result," one of the component elements of the corpus delicti. The criminal agency of another as the means is satisfactorily established by the crushed skull, the bloody club, the bloody ground and weeds, and the crushed grass showing where the body had been dragged. Let it be remembered that, so far, the crime is established without the testimony of any of the three women, or of James Smith. In Wills on Circumstantial Evidence, 6th Am. Ed., page 214, it is said: "But, in accordance with the principles which govern the proof of every other element of the corpus delicti, it is not necessary that the cause of death should be verified by direct and positive evidence. It is sufficient if it be proved by circumstantial evidence which produces a moral conviction in the minds of the jury equivalent to that which is the result of positive and direct evidence." This view of the writer is adopted by this court in Laughlin v. Commonwealth, 37 S. W., 590. In Johnson v. Commonwealth, 81 Ky., 325, it was held that the corpus delicti could be established by circumstantial evidence. In Flinchem v. Commonwealth, 89 S. W., 1129, the same rule was declared, and a conviction was upheld, though the evidence connecting the accused with the homicide was wholly circumstantial. Certainly the circumstances detailed, entirely apart from the testimony of the eye witnesses, are enough to convince any average mind of the fact that the negro Ed was dead, as the result of the criminal agency of another.

We come now to discuss the criminal agency of the appellants, whether there was sufficient evidence to take the case to the jury upon the question of whether they committed the crime. In the first place it is to be remembered that that fact is likewise a fact which may be established by circumstantial evidence. Commonwealth v. Murphy, 109 S. W., 353; Flinchem v. Commonwealth, 89 S. W., 1129, and many other authorities. If we but let our minds revert again to the facts detailed by the witnesses, tracing the association of the condemned and the decedent almost to the place of the killing (all again independent of the eye witnesses to the actual killing) the finding of the handkerchief, the Enquirer, the Wiedeman beer case, the rifled purse, and the dead body there, we would pause long before we could convince ourselves that the condemned men's guilt had not been clearly made out by these, in themselves, most convincing cir-

cumstances. In the next place, there is the direct and positive testimony of the three witnesses, the women indicted as accomplices, that the appellants killed the negro stranger. But, say the appellants, these women are accomplices; and their testimony has not sufficient corroboration to uphold the conviction. Sections 241-2, Criminal Code. They are corroborated in every single circumstance, practically, save in that they are the only witnesses introduced by the Commonwealth who actually saw the deadly blows struck. It is erroneously assumed by appellants that they were accomplices. The fact that they were so indicted does not make them so. Ochsner v. Commonwealth, 128 Ky., 761; Sizemore v. Commonwealth, 6 S. W., 123; Nelms v. Commonwealth, 82 S. W., 260. That fact, like any other fact, is one to be ascertained from the evidence. ''Whether the witness is in truth an accomplice is left to the jury to determine, and if they conclude him to be such, then and then only are they to apply the rule requiring corroboration.'' Wigmore's Evidence, section 2060. In the case at bar, the question of accomplice vel non was aptly left to the jury; and as our method of criminal procedure submits only the general issue to the jury, and does not admit of answer by them to any intermediary questions in the record, it is fairly to be assumed that, had the jury any reasonable doubt about the corroboration, they nevertheless rightly found their verdict of guilty, after going through the mental ascertainment that, under the instructions, the women were not accomplices, and that corroboration was not necessary.

There has been much written upon the subject of the corroboration of accomplices, a great part of which, because based rather upon the facts of each particular case, than upon any general principle, is profitless and without enlightenment. The doctrine grew up under the common law and has become the statutory demand of our Criminal Code. The rationale of it seems to have rested upon an inherent distrust of the testimony of one who, by testimony, might secure the conviction of another rather than himself, or who might be testifying under the lure of immunity commonly supposed to follow from ''turning State's evidence.'' It was a wise custom of the judges who, under the ancient practice, in summing up to the jury, were vested with the function of discussing the weight of the evidence, to remark upon the selfish, and, therefore, doubtful, nature of the testi-

mony of accomplices. The judges had a latitude of expression, and by proper explanation the reason was made apparent to the minds of the jury, so that under the admonition of the court, they could in reality weigh the testimony. Our statutory rule is much more hard and fast. Under it no credence can be given to the unsupported testimony of an accomplice; and while we take the statute as we find it, it is well enough to consider that it is a rule founded upon reason, and is not an arbitrary security built up by our General Assembly for the criminal to shield himself behind. The cases of Lane v. Commonwealth, 134 Ky., 519, and Simpson v. Commonwealth, 126 Ky., 441, which are relied upon by the appellants, do no more than say that the statute means what it says, i. e., that an accomplice must be corroborated. Conscious of how awful a thing is death, and how the lives of these two unfortunate, yet criminal, negroes rest upon our consideration of this case, we have reached our conclusion with sorrowful reluctance; but we have reached it with a degree of mental certainty that leaves no alternative save to execute the law. It is clear to us that the testimony of the women is corroborated to the fullest degree demanded by the statute; and conceding that they are accomplices, for the argument, the conviction upon this feature is without error.

There remain only the instructions, of which complaint is made.

Instruction 7, given by the court, told the jury that unless they should believe from all the evidence, beyond a reasonable doubt, that the defendants had been proven guilty, they should find the one or ones as to whom the doubt existed not guilty. The appellants complain that this instruction warranted the jury in finding the defendants guilty upon the testimony of accomplices alone; and argue that it should have embraced, as a part of it, a reiteration of the necessity of evidence other than that of the supposed accomplices. It will be remembered that it was for the jury to say whether the three women were accomplices. And, conceding for the argument, that they were, the record discloses that by instruction No. 5 the jury were told, by an apt and proper instruction, that they could not convict upon the testimony of the women alone, if they were accomplices, and were fully advised as to the nature, character and amount of corroborative testimony necessary to warrant a conviction. It is unnecessary to write the whole

of the law into every instruction. It suffices that the intent and meaning of the trial court be clearly apparent to, and comprehended by, the jury.

Instruction No. 5, which outlined to the jury the necessity and nature of the corroborative circumstances, treated only of the three women as accomplices, and only told the jury that their testimony, if the jury believe them to be accomplices, would need to be corroborated. The appellants complain that it was error to have omitted from this instruction the name of James Smith as one of the accomplices whose testimony needed corroboration. It will further be remembered that in our view expressed above, the testimony admitted, down to the close of the Commonwealth's testimony, not only was sufficient to take the case to the jury, but was sufficient to justify, if not to demand, a conviction. The position of the appellants then is, that notwithstanding the fact that the Commonwealth had made out its complete case, they, the defendants, by introducing one of them in their own behalf, or, more properly speaking, by one of them taking the stand in his own behalf, could alter his position from that of a witness for the defense to that of a witness for the Commonwealth, and require the court, throughout its instructions, to treat him not otherwise than as a witness for the Commonwealth, and to require corroboration of his testimony not otherwise than as if he had been introduced for the Commonwealth, instead of voluntarily appearing for himself. We have commented upon the reason back of section 241 of the Criminal Code. The distrust attaching to a witness whom the Commonwealth might put upon the stand, arising from the witnesses' supposed promise of immunity, does not apply and can not apply in favor of one accused, who is not called or used by the Commonwealth, but who appears of his own volition for the defense. The framers of the Code did not intend this provision, it seems clear to us, to be used as a shield by the defendants on trial, when themselves testifying for themselves. One very clear evidence that such was not the intent of the Code makers lies in the fact that when sections 241 and 242 of the Criminal Code were written, there was also written section 234, which provided that, where two or more persons were under indictment charging a conspiracy among them to commit a crime, they could not testify the one for the other. A conspiracy was charged in the indictment at bar. Under the law, therefore, as it

stood when the Code was written, plainly the defend-
ants could not have argued that section 241 applied to
a defendant voluntarily testifying for the defense, be-
cause neither of the defendants could have testified for
the other. It is true that section 234 of the Criminal
Code was subsequently repealed, so that those accused
of crime can freely testify; but they testify of their own
volition; they can not be compelled to testify for the
Commonwealth.

It is further argued that instruction No. 5 was er-
roneous, because it told the jury that in case they be-
lieved the women were accomplices, a conviction could
not be had upon their testimony, unless corroborated by
other evidence tending to connect "the defendants"
with the commission of the offense. It is argued that it
is reversible error, because the instruction did not run
as to "the defendants or either of them." But in in-
struction No. 3 we find that the jury were told that they
might find either defendant guilty or not guilty; and
again in No. 7 they were told that unless they believed
that the defendants or either of them had been proven
guilty, beyond a reasonable doubt, they should find the
one or ones as to whom they had such doubt, not guilty.
The instructions as above set out are to be read together.
When that course is followed it is clear that the law was
given with substantial accuracy and in such apt lan-
guage as that the defendants were not prejudiced. It
is impossible for any one writer to use words which will
escape criticism of those who, like the appellants, are
in extremis; but it is not the use of this precise word or
that which determines whether an instruction is correct.
It is, per contra, the ideas, the law, embraced or ex-
pounded by the words. If, in a reasonably intelligible
way to a reasonably intelligent mind, the court has given
the whole law in a criminal trial, we will not reverse for
narrow, technical or linguistic complaints. The objec-
tion must be real, not fanciful. It must be such as to
have militated against a fair trial of the defendant. It
must be such as to have prejudiced his substantial
rights, before we will reverse for it.

The affirmance of the judgment of the trial court is
an unpleasant duty to us and one that we would gladly
escape if it were in our power. It is doubly hard that
there should have entered into the trial, as a part of the
testimony against these men, the evidence of the wanton
and degraded women who testified. It is one of the mis-

fortunes which is met in the execution of the criminal law that witnesses of high character and integrity, ordinarily, are not to be found to crimes like this. The very nature and character of the wicked and depraved men who engage in unjustifiable murder are such as that they find companions only in others equally low in depravity and equally lacking in moral sense. The jury, however, saw them and heard their story; and it is not for us to say that the jury should not have believed them. Fortunately, for the satisfaction of the trial court, the trial jury, and of us, however, it is to be remembered that there is evidence sufficient to sustain the conviction, without the testimony of these women.

The judgment of the trial court is affirmed.