## Herron v. Commonwealth
(Decided Dec. 13, 1932.)

C. C. BAGBY, CHAS. T. CORN and TOM UNDERWOOD for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

This is an appeal from a judgment convicting appellant of assault with intent to rob, and fixing his punishment at five years' imprisonment.

The facts are these: Appellant and his wife, whom he married after this prosecution began, lived in the same house on Sixth street in Danville with J. D. Shouse and his wife, Mary Shouse. About 7:30 p. m., August 16, 1931, appellant and Shouse left the house together. About 8 o'clock they were seen together in front of the Palace of Sweets by George Shouse, a younger brother of J. D. Shouse. At that time appellant had in his bosom a pistol which was afterward identified as belonging to J. D. Shouse, and was found near the place of the alleged crime. Appellant was also seen by Jesse Davis coming up the street with a gun in his hand, which he afterward placed underneath his shirt or belt. The last Davis saw of him he turned the corner going out North Fourth street. Between 9:10 and 9:20 p. m. Joe Elliott, who lived at 206 Maple avenue, Danville, and conducted a filling station at Hardin & Cottage avenue, closed the

station and started for his home. After going a few yards and reaching a point in the rear of the Glore property, two men caught him around the arm, and said, "Stick them up." One of them shot him in the back. After struggling for a while Elliott got out his pistol and shot one of the men. He then slung the other man around and fell over in the ditch. He was not able to identify either of his assailants, but Shouse was killed and his body was found a few feet away. Ed Renfro, who lived on Seventh street, three doors below West Lexington street, was sitting on his porch about 9:30 p. m. He had heard noises that he thought was an automobile backfiring. Thereafter a fellow came by running toward Lexington street. He did not recognize him until the next morning. The man was four or five feet tall, and he could not tell how he was dressed. The police bell rang before the man went by. Leslie Prewitt, who lived on North Seventh street, was seated on his porch, and also heard some shots that he took to be the backfiring of an automobile. This was between 9:30 and 10:00 o'clock. He also heard the police bell, which rings when the police are wanted. He knew appellant and saw him after he heard the noises and police bell. Herron came out Rowe street and turned down Seventh. Herron was in a jog. It seemed to him that Herron turned toward Sixth street. H. T. Hamner, who lived on Cottage avenue about 50 feet from where the holdup took place, heard two shots, and a few seconds later, two more shots. He saw a fellow come running towards his house, and turn in the alley. A fellow came out and peeped around the corner. Hamner then went down and saw the body of Shouse. It was about fifty-eight steps west of where the holdup occurred. He saw no pistol near Shouse's body. Ollie Hazelwood and Mr. Critchfield found Shouse's pistol about 150 feet from his body, and about 16 feet from the gate at the Glore home. Mrs. Shouse testified that she and her husband were living with Herron and Mary Wilkerson. Appellant and her husband first left the house between half-past six and seven, and then returned. After remaining there about five minutes they disappeared, and she saw and talked to her husband as he was going away. After that she saw appellant between 9 and 10 o'clock. When appellant came in the back door, he did not say anything at first. He seemed to have been running, and was out of breath. Later she asked him where her husband was. Appellant

said they had gotten into some trouble with a man at the filling station; that they were shot at and recognized; and that J. D. (her husband) ran toward Perryville. He also said, "The law will be down here right away, you tell them that J. D. and I went to town and Mary Tom followed us, so I come back and J. D. went to his father's to stay all night, and me and Mary Tom got in an argument and I went back to town and she followed me again."

On the other hand appellant says that he left his home on Sixth street about 7:30 o'clock with Mr. Shouse, and came up into town. Mr. Steinberger was standing at the corner of Third street and spoke to Mr. Shouse. Steinberger worked with a show. They then walked back to the Palace of Sweets. He had no pistol on him. As they reached there he saw a prisoner who had escaped from the work house of which his father was keeper. The prisoner claimed to be out by permission of his father. He called his father over the phone. Afterward he went to his brother's service garage. Steinberger bummed his brother for a piece of money. After some further conversation he and Shouse started back to Sixth street. He went along to the driveway that leads up to the work house. His wife came across the street and called to him. He told his wife he was going home. He never saw Shouse any more that night. He went to the work house to get a little money from his mother to buy cigarettes and a few little things he needed. After leaving Shouse, Shouse turned back toward Main street. It was then a few minutes after nine. After leaving Shouse he walked directly to the side door to his mother's room. His mother and youngest sister were in bed. His wife sat on the side of the steps and would not go in with him. He asked his mother for a little money. He left the work house in the neighborhood of 10 o'clock. His wife was waiting for him and they went back to Sixth street. He did not participate in the hold-up, and was not in that neighborhood. He could not say exactly what time it was when he reached home. He did not see Mrs. Shouse. His wife went to bed, and he was sitting on the side of the bed talking to her when the officers came. At no time that night did he pass up or down Rowe street, or up Seventh street in a run or jog. He was not on those streets that night. He had on a light gray pair of pants and a light green shirt, and a white cap. Mrs. Shouse had been drinking that evening.

He saw her drink some whisky and home-brew. When he and her husband left that evening, she seemed to be pretty drunk. He was never back at the house after he left there about 7 o'clock until he and his wife returned about 10 o'clock. On cross-examination he stated that he stayed at his mother's until pretty close to 10 o'clock. He was in the room when the court house clock struck nine. He did not remember saying, "There is nine o'clock, I must go home." He thought there was something said about the time. He thought they mentioned something about the police bell. It seemed like about 15 after nine when the police bell rang. William Phillips saw appellant and his wife down on Lexington street just past the new church at about ten minutes to ten, or ten o'clock. At that time they were going west. Mud Gibson, who was present with William Phillips, did not remember whether he saw appellant or not. Ed Sheens, who was with Jerry Phillips, William Phillips, and Mud Gibson, heard Jerry Phillips, "holler" "Hello, Slick" but did not see him. Jerry Phillips, one of the party, "hollered" at Slick, who was then on Lexington street, and recognized him. It was between 9:30 and 10 o'clock. Mrs. Luther Herron, mother of appellant, testified that she and her husband lived at the work house, which is located near Fourth street. Her son came in after 8 o'clock. At the time she was in the office room reading. Her daughter, Sadie, and Mr. Herron were with her. They had gone upstairs and gone to bed when appellant came upstairs. He came up about eight-thirty. Appellant left before ten. While there the clock struck nine, and Sadie told appellant to go on home—she wanted to go to sleep. She heard the police alarm and at that time appellant was there. Appellant wanted some money to buy cigarettes. She told him to look over on the dresser, and he found a few lying there. Appellant between the time he first came and the time he left never left the house. The only time she saw him after he left was between 11 and 12 o'clock. Sadie Herron testified that when appellant came to the room she was in bed. It was after 8 o'clock and going on nine. She did not know how long he stayed there. He was there when the town clock struck 9 o'clock. Luther Herron, keeper of the work house, heard somebody come in the side door and go upstairs. He did not see him. He guessed it was eight or a little later. About 11 o'clock that night appellant came to the house. Before that time he had had a con-

versation with appellant in regard to a prisoner who had run off from the work house. Mrs. Shouse's moral character was impeached by two witnesses.

In rebuttal it was shown by the chief of police that appellant's reputation for truth and veracity was bad.

The indictment reads as follows:

"Commonwealth of Kentucky

"Boyle Circuit Court. September Term, 1931.

"Indictment against Seeley Herron

"The grand jury of the County of Boyle in the name and by the authority of the Commonwealth aforesaid accuse Seeley Herron of the crime of unlawfully, maliciously and feloniously with an offensive weapon assault another person with the felonious intent to rob said person committed in manner and form as follows: The said Seeley Herron in the County and State aforesaid on the 16th day of August, 1931, and within twelve months last passed, and before the finding of this indictment, did unlawfully and willfully and maliciously and feloniously assault Joe Elliott with an offensive weapon, a pistol and in and by a forceable and violent manner, by grabbing and holding said Joe Elliott, demanded money from him with the felonious intent to rob said Elliott; and together with J. D. Shouse, who is now dead, conspired and confederated together and went forth armed with offensive weapons to hold up and rob said Elliott and did maliciously and feloniously with a pistol an offensive deadly weapon assault and hold up said Elliott with intent to rob in Danville. Against the peace and dignity of the Commonwealth of Kentucky.''

It is argued that the indictment contains more than one offense, and that the court either should have sustained the demurrer to the indictment, or have required the commonwealth to elect. It will be observed that the indictment charges appellant with the offense, and then attempts to charge that he conspired with Shouse to commit the offense, and did commit the offense. Not only may an indictment charge that a particular crime was committed in different modes and different means, section 126, Criminal Code of Practice; Hannah v. Commonwealth, 242 Ky. 220, 46 S. W. (2d) 121, but it is equally well settled that an indictment may charge a

particular crime, and also a conspiracy to commit the crime. Salisbury v. Commonwealth, 79 Ky 425. But aside from this, even if we go further and assume that the indictment is duplicitous, it does not necessarily follow that appellant was prejudiced by the failure of the court to sustain the demurrer to the indictment. In the recent case of Canada v. Com., 242 Ky. 71, 45 S. W. (2) 834, the indictment charged that the defendants willfully and maliciously shot and wounded Margaret Canada, and also John Canada, Jr., with intent to kill them. Though holding that the indictment charged two offenses, and was therefore demurrable, we held that the error in overruling the demurrer was cured by the instructions which confined the jury to the shooting of one of the persons. In the case at bar the court did not instruct on conspiracy, or any other offense than assault with intent to rob. Clearly, this was equivalent to an election by the court, and the overruling of the demurrer, even if erroneous, was thereby cured, and did not operate in any way to the prejudice of the appellant.

The further point is made that there was no evidence connecting appellant with the alleged offense, and no evidence showing that Elliott's assailants intended to rob him. Appellant lived in the same house with Shouse. The evidence shows, and appellant admits, that on the night of the difficulty he and Shouse left the house together, and continued together until he started toward the work house. He was seen by one witness coming up the street with a gun in his hand, which he afterwards placed underneath his shirt or belt. Another witness saw him with a gun protruding from his bosom. After the shots were fired, and the police bell had rung, Leslie Prewitt saw appellant in a jog come out Rowe street and turn down Seventh street. It seemed to him that appellant turned toward Sixth street. According to Mrs. Shouse appellant came to his home. He appeared to have been running and was out of breath. On inquiring where her husband was, appellant said they had gotten into some trouble with a man at a filling station; that they were shot at and recognized; and that J. D. (her husband) ran toward Perryville. At the same time he attempted to fix an alibi. In the light of the circumstances and the positive testimony of Mrs. Shouse, it was for the jury to say whether appellant participated in the holdup. But it is said that there was no evidence of an intent to rob. In support of this posi-

tion it is argued that there is no showing that any money was demanded or taken from Elliott, or that Elliott was searched, or that there was any effort whatever to take from him any money or other thing of value. It was not necessary to prove these things in order to show intent to rob. When men draw their pistols in the nighttime and command a citizen en route to his home to "stick them up," common sense and common experience teach us that their purpose is robbery. As actions speak louder than words, the intent to rob was the only fair and reasonable inference that the jury could draw from the proven facts. We conclude that there was sufficient evidence to take the case to the jury, and sustain the verdict.

There is the further contention that the court erred in not instructing on common assault and battery. It is the rule that common assault and battery is a degree of the crime of assault with intent to rob, and that an instruction thereon should be given when authorized by the evidence. Abner v. Commonwealth, 210 Ky. 536, 276 S. W. 513. Here Elliott, the person assaulted, was an eye-witness to the assault. No previous enmity or hostility between Elliott and his assailants was shown. Nothing occurred at the time of the assault to indicate that it was the result of anger or resentment then or previously aroused. In the circumstances there was no evidence showing a mere common assault and battery, and the court did not err in failing to submit that issue to the jury.

The court did not err in failing to instruct under section 240, Criminal Code of Practice, providing that a confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such an offense was committed. In the first place it is unnecessary to instruct under that section where the corpus delicti is proved by evidence other than the alleged confession of the accused. Dunbar v. Commonwealth, 192 Ky. 263, 232 S. W. 655. In the next place an instruction is unnecessary where the statement of the accused is a mere statement against interest, and does not amount to a confession. Eldridge v. Commonwealth, 229 Ky. 499, 17 S. W. (2d) 403. Here the corpus delicti was proved by other evidence, and appellant's statement to Mrs. Shouse that they had gotten into some trouble with a man at the filling station, and

that they were shot at and recognized, was a mere statement against interest, and did not amount to a confession that he had assaulted Elliott with intent to rob.

The court did not err in refusing a new trial on account of newly discovered evidence. For the most part the evidence relied on is either impeaching or cumulative, and, taken as a whole, it is not so decisive or unerring in character that it would probably bring about a different result on another trial. Bowling v. Commonwealth, 230 Ky. 387, 19 S. W. (2d) 1086; Keser v. Commonwealth, 195 Ky. 809, 243 S. W. 1020.

On the whole we find no error in the record prejudicial to appellant's substantial rights.

Judgment affirmed.