## Hawk v. Commonwealth.

Oct. 29, 1940.

J. S. Sandusky, Judge.

218

Kennedy & Kennedy for appellant.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The case presents a mystery. It remains clothed in grave doubt notwithstanding the verdict of the jury.

In the morning of Thanksgiving day, 1939, the body of a man was found hanging to the limb of a tree on the side of a private lane leading from the Parkers' Mill Road about a quarter of a mile from U. S. Highway No. 27 in Pulaski County. It was hanging by a piece of barbed wire. The limb was parallel with, above and about a foot over from a fence from which the strand had been taken. There was red mud on the top wire and a post and a mark of the wire on similar mud on the soles of the man's shoes. The fence was about four feet high and the body was two and one-half feet above the ground.

The body was identified as being that of Jack Guf-

fey who had lived in Cleveland, Ohio. On Wednesday, the day before, he had left home ostensibly to go to work, but his wife felt that he was going elsewhere, one of the reasons being that he had awakened his two and a half year old child and kissed her goodbye. She received a letter from him postmarked at Medina, Ohio, at 12:30 p. m., that day. It was addressed to both his wife and child and began: "I am all broken up and awfully sorry for what I have brought on you and the baby and myself." It continued with an expression of remorse over his marital infidelity and the suggestion of a venereal disease. He stated that he was enclosing his "pay stubs," saying that would be enough to keep his baby and wife until she could withdraw some savings the next month, and he told her where she could find $125 concealed at home. He expressed regret over the necessity of having to take "that cash," but felt it was necessary for his use until he could find work, and stated that when he did he would start "sending to you and the baby." He felt "awfully sorry about everything and my job at the shop" and over having told something about "Uncle Joe," which had been done because he was "easily swayed." The letter continued:

> "I feel so bad about how the boys treated me at the shop for I am really not bad at heart and anyone who knows me will say so. I must close and get this mailed so take good care as you can of Margaret and I know my folks will help you all they can."

Another letter was received by the wife postmarked Columbus, Ohio, at 5 p. m., the same day. He had forgotten to enclose the "pay stubs" in the first letter and was sending them. He wrote:

> "I can always get by somehow alone but its lots harder for you with the baby. I am missing you both more and more. I guess I will go by home for awhile and see how they are. You know I won't never let you and Margaret down. Tell Chick and John we will probably get together some more sometime. Bye both of you until later. With love, Jack."

His widow testified on the trial of the appellant, Monroe Hawk, charged with the murder of Guffey, that there was never any trouble at home and that her hus-

band had not seemed worried over anything. He had enclosed $40 with the second letter. His parents lived at Athens, Tennessee, which could be reached by Highway No. 27.

There were a few superficial wounds or marks on the body, none of which could possibly have caused his death. One of these was a slight wound on his wrist which had bled some, but was not deep enough to have been dangerous. There were some marks on his arm which could have been made by a hypodermic needle. There were two or four small wounds or lacerations in his neck, but no blood around them. These were apparently caused by the wire and a barb in it. The coroner testified there was a little bruised place on the man's face, but other witnesses had not seen it. No autopsy was performed. His hands were not tied and the situation gave no indication of any sort of struggle either of the body or by anyone around the place. The body was slightly warm when discovered. In the man's automobile about 100 yards away were found a small pen knife with a little blood on it; two dram glasses, but without odor; a bill-fold and some change scattered on the seat of the car amounting to a little over a dollar.

Dr. Spradlin, who had seen the body at the undertaker's shop, was not asked about the extent or character of the wounds in the neck but only whether or not "if deep wounds were made on the neck of a living person" they would bleed. He answered that they would profusely, but if made on a dead body they would not bleed because of the absence of circulation. He and two other doctors expressed the opinion that from the way the body was hanging, as shown in the photographs, death would not have resulted from strangulation or immediately but from exhaustion and it would have been a matter of an hour or two. Dr. Wahle thought there might be some doubt whether death could have been caused in this manner, judging by the photographs. He stated that even if committing suicide the body would have shown some involuntary resistance or struggle. Dr. Cundiff testified that it was possible the man's head and neck changed positions from the moment "he took the leap" until the photographs were taken. He further testified without objection that a man could not have stood on the wire fence and adjusted the noose although the doctor saw where some steps had been made on the

wire and a dirt stain on the man's shoes. Thus the evidence of the commonwealth tended to establish contradictory causes, namely, that the hanging was not the cause of the man's death and that there was nothing on or about the body that could have caused it. Yet, here was a dead man.

The evidence tending to connect the defendant with the death of Guffey is equally unsatisfactory. Everett Jones testified that on that Wednesday night he and Hawk and his sister had been to a roadhouse and when they had returned to Somerset the defendant who was drunk got out of the car at a certain point about 11 o'clock, which was convenient to his home. On Friday night the three of them again went out to that roadhouse. On the return trip, in discussing the finding of Guffey's body, about which there had been a great deal of talk around town, Hawk, who was drunk, said:

"He was coming back toward town, and that when he got along about where the old bank used to be, down here on Main Street, a Ford car come along, and they said to him, 'Boy, do you want to take a ride,' and he said he got in the car—he said there was four men and a woman in the car—and he said they come on down to Johnson's Block, and there was a car with an Ohio license come along, and they followed it. He said it was a Chevrolet Car—he said they went on out to the lane there that goes to Parkers' Mill, and went on out there to where this man was hung—and he said they took the man out of the car, and took him over there and hung him."

Hawk told them that they had hung the man for a "little over $100.00" and left some change of a little over a dollar on the automobile seat. He had related that on the return from the murder they had told the woman with them that if she told anything they would kill her; and also that somebody in the crowd struck him (Hawk) over the head with a bottle and threw him out of the automobile. He had waved down a truck and ridden back to Somerset in it. Hawk called a name or two, which the witness did not remember, and boasted that he knew enough to ruin them. The defendant's younger brother testified that on Saturday night while drunk, he had said that he was afraid that "Chief Jasper" was "going to try to lay it on him." Jasper, the chief of police of Somerset, had frequently arrested

Hawk. Lonnie Mincey testified that he was driving a truck of tobacco to Lexington on Wednesday night over Highway No. 27 and between 11:30 and 12 o'clock he had seen an automobile parked at the Parkers' Mill Road with the lights burning. The defendant Hawk was back of the car and another man on the left and a woman on the right of it. The car bore either a Michigan or Ohio license. One of Mincey's companions testified they were going to Maysville with the tobacco; that he had seen a parked car at the place but there were no lights on it and he saw no person about it. Mincey's brother, who was also with him, did not testify and his absence is not accounted for. The roadhouse visited by Jones, Hawk and his sister on that Wednesday night was a short distance beyond where this car was parked. Thus again appears the incongruity in the commonwealth's position, namely, that the man was otherwise killed and his body hanged to give an appearance of suicide, while the only evidence of murder is that he was killed by hanging.

The defendant did not testify. His attorney excuses his non-appearance on the ground that his recollection was very hazy as to what he had done or said during the period because of continued drunkenness. His sister, who had been with him and Jones on both of the occasions described, testified that on Friday night Hawk had related to them that he had got in a Ford car and followed a Chevrolet down the road to Parkers' Mill Road on that Wednesday night, but she denied that he had told any such story as that related by Jones. The defendant's mother testified that he had come home about 11 o'clock that night so drunk that she had to assist in undressing him and putting him to bed. His brother testified that he had slept with him all that night.

Appellant's counsel argue that the evidence of the killing was not sufficient to take the case to the jury, the basis being not only the speculative character of the evidence tending to show that a crime was in fact committed but also that all the statements attributed to the defendant by Jones declaring his culpability were only those foolishly made by a blathering, drunken boy. The Assistant Attorney General says: "There is a great deal of inflated ego in most criminals. They delight in relating their exploits, especially when under the influ-

ence of drugs and intoxicating liquors.'' In short, one says this was the liquor talking; the other, the man talking, his tongue loosened by liquor. We refrain from passing on the question of the sufficiency of the evidence either to submit the case to the jury or to authorize the instruction predicated on the methods of killing by ''striking, hitting or by hanging, or by a combination of said means in and upon the body, arms, and person of'' the deceased, as is charged in the indictment.

In a homicide case proof of the corpus delicti has two component parts, namely, a death and criminal agency as the cause, that is, proof that a crime has been actually committed. Higgins v. Commonwealth, 142 Ky. 647, 134 S. W. 1135; Ratliff v. Commonwealth, 182 Ky. 246, 257, 206 S. W. 497; Denham v. Commonwealth, 239 Ky. 771, 40 S. W. (2d) 384; Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. (2d) 34. Like the element of guilt of an accused person, the existence of a crime may be established by circumstantial evidence, subject, of course, to the general rule that it is not sufficient if it is as consistent with the absence of a crime as with the perpetration of one. Johnson v. Commonwealth, 81 Ky. 325; Higgins v. Commonwealth, supra; Smith v. Commonwealth, 148 Ky. 60, 146 S. W. 4; Denham v. Commonwealth, supra.

A confession is a voluntary statement made by a person in which he acknowledges himself to be guilty of an offense or discloses the existence of the act and the share or participation which he had in it. The distinction between a confession and an admission is that the latter is only a self-incriminating statement short of an acknowledgment of guilt, or a statement of an isolated or independent act tending only to show guilt or criminal intent. Ratliff v. Commonwealth, supra; Sargent v. Commonwealth, 263 Ky. 429, 92 S. W. (2d) 770.

The legislature has declared by Section 240 of the Criminal Code of Practice that unless it be made in open court, a confession of an accused person will not warrant a conviction unless accompanied by other proof that such an offense has in fact been committed. From the beginning it has been held that under the statute it is the duty of the trial court to instruct the jury accordingly unless the corpus delicti has been proved by evidence other than the alleged confession, or unless the defendant's commission of the crime has been proved

by other witnesses and the defendant has repeated his confession in his testimony, or unless the statement of the accused amounted only to an admission of an incriminating act. Abdon v. Commonwealth, 237 Ky. 21, 34 S. W. (2d) 742; Cornett v. Commonwealth, 240 Ky. 694, 42 S. W. (2d) 901; Herron v. Commonwealth, 247 Ky. 220, 56 S. W. (2d) 974; Sargent v. Commonwealth, supra. And if there be doubt that a crime has been committed, such as where the corpus delicti has not been conclusively proved, or has been established only by an extra-judicial confession of the accused, a specific instruction under Section 240 of the Code of Criminal Practice should be given. Higgins v. Commonwealth, supra; Bond v. Commonwealth, 236 Ky. 472, 33 S. W. (2d) 320; Gilliam v. Commonwealth, 263 Ky. 342, 92 S. W. (2d) 346. Moreover, where there is contradictory evidence as to whether a confession was in fact made, it is error for the court to assume that it was made. Cunningham v. Commonwealth, 72 Ky. 149, 9 Bush 149; Cf. Wendling v. Commonwealth, 143 Ky. 587, 137 S. W. 205.

While the one element of a corpus delicti, that is the existence of a dead body, was proved other than by the confession of the accused, the other element, that is that death was caused by the criminal violence of some person other than the deceased himself, was not proved except by a deduction from the situation surrounding the body that is far from being satisfactory.

We have an analogous case in Polson & Polson v. Commonwealth, 108 S. W. 844, 32 Ky. Law Rep. 1398. The body of a woman was found in a pond about 100 yards from her home. Both her eyelids and her lower lip were cut, and there was a bruise on one of her temples, on an arm, and a leg. She had on a bonnet, which was pinned back of her head, and some kind of cloth wound about her head. Porter Polson had married the woman's thirteen year old daughter a few days before. He and Henry Polson were convicted of her murder and sentenced to death. Aside from some circumstantial evidence, there was only a statement by Porter Polson in effect that Henry Polson had committed the murder and that they had carried the body and put it into the pond. Polson excused or explained the statement. The court observed that the evidence left the mind in doubt as to whether or not the woman had been murdered by anyone and, if so, by whom; that the evidence created

the suspicion that the woman had come to her death by a suicidal drowning; likewise that it cast a suspicion of guilt of murder upon another party as well as upon the appellants. The opinion of two physicians on the question of suicide or murder, as judged by the condition of the body, was contradictory. The judgment was reversed because the trial court did not give an instruction under Section 240, Criminal Code of Practice.

In the present case the court did not give any instruction under Section 240 of the Criminal Code of Practice. Here again is an inconsistent position. If the statement be not a confession as to the existence of a crime and as to its commission by the accused defendant, then obviously there was no proof whatever of the defendant's guilt. The entire evidence of probative substance presented by the Commonwealth consisted of this statement. There could be no better test of a confession as contradistinguished from an admission. We think it was error not to have given the instruction.

Judgment reversed.