## Jackson v. Commonwealth.

May 3, 1946.

Roy G. Garrison and Richard Bryan for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Reversing.

Glenn Jackson, appellant, was indicted for the murder of Juanita Tilley. It was charged in the indictment that the woman died within a year and a day after and as the result of being struck and beaten about her head and face by appellant with his hands and fists, and of being choked by him with his hands and by placing a necktie around her neck and twisting it. A trial resulted in his conviction of voluntary manslaughter and appellant's punishment was fixed at confinement in the penitentiary for a term of 15 years.

The motion for a new trial assigned seven errors, but since we have concluded one of them—there was not sufficient evidence upon which the jury could base a conviction—is well taken, it will not be necessary to consider or discuss the others.

Despite the fact that they were both married (Juanita's husband was in the army and appellant's wife and children were residing in Benton, Ky.), this man and woman were living together in a rooming house in Paducah. He was a mechanic engaged in installing furnaces, while she worked as a waitress. Their lives did not run smoothly, they were not happy and quarreled quite a bit over money.

Juanita visited her aunt, Mrs. Elsie Calhoun, at Newburn, Ky., several days and returned to Paducah on May 13, 1945, and went to Jackson's room with her suitcase. Her eyes were blacked and upon his inquiry as to the cause, she replied, "That's my business." The next morning, Monday, May 14th, and eight days before her death, they got into an argument while she was hanging up some clothes in his room. She had one of his ties hanging loose around her neck and he grabbed the

tie, pulled her to him, choked her with it and then slapped her several times in the face. She told him if that was the way he was going to treat her she would leave. He replied that was satisfactory to him. But she did not leave and asked him to let her stay until her eyes cleared up, to which he agreed.

On Saturday following the Monday he slapped and choked her, Jackson told Juanita that her eyes were clearing up and he wanted her to leave and she said that she would. Appellant left his room Sunday morning and went out in town. Upon returning to the room an hour or so later he found her crying and she informed him that she had swallowed poison, GX-5, known as ''Metal-Life,'' which she got out of his grip and was used by him to remove carbon from gasoline engines. He advised her to go to the bathroom and vomit, which she did, but she would not let him call a doctor.

Appellant had to go to Benton to install a furnace and in the middle of the afternoon of Monday, May 21st, he took her to the home of Mrs. John Grant in Paducah, where Juanita had formerly roomed. She informed Mrs. Grant that she had tonsilitis and had painted the outside of her throat with iodine. She vomited up some chocolate-colored substance at Mrs. Grant's and appellant asked Mrs. Grant to call a doctor, saying he would be back and pay her the next afternoon when he returned from Benton.

Dr. R. C. Overby was called and Juanita told him she had taken poison. The doctor testified her color and pulse were bad and he sent her to the hospital. She died that night about 12 o'clock, and appellant was arrested upon his arrival in Benton around 2 o'clock on the morning of May 22d, and was charged with the murder of the woman.

On Thursday before her death, Juanita told another roomer, Miss Powers, that the discoloration of her eyes and neck was the result of an encounter with a drunken man while she was working in James Coffee Shop the preceding Monday. Her neck was painted with iodine at the time of this conversation. On this same Thursday she told practically the same thing to Mrs. McCann who ran the rooming house. On the Monday afternoon that she went to the hospital, Juanita told Ann Grant that she had taken poison, fainted and had hurt her face,

eyes and neck in falling against the bathtub and door. At the hospital the night of her death, Juanita told Lyle Molloy, a policeman, and Dr. E. R. Goodloe that her throat and eyes were hurt when she fainted and fell against the bathtub.

Drs. Goodloe and Grossman performed two autopsies. They found her tongue cut and the hyoid (a small unattached bone in her throat) fractured. There was no evidence of poison burns in the mouth and the doctors thought a rupture or hemorrhage of a blood vessel at the base of the brain, and not an external injury, caused the discoloration about the eyes.

The organs were removed from her stomach and sent to Brooks L. White, a chemist and toxicologist with the FBI Laboratory in Washington, for examination. He ran a test for traces of "Metal-Life," the poison the woman said she swallowed, which contained iron carbonalite (which we understand from the record may be dissolved and form carbon monoxide). White testified the body had been embalmed before the stomach was removed and that the formaldehyde in the embalming fluid might destroy the "Metal-Life," therefore he was unable to determine whether or not she had taken this poison. Several tests were made by White on rabbits in which he gave them this "Metal-Life," and he testified that in every instance it was fatal to them.

Carl H. Henrichs, an analytical and consulting chemist and toxicologist who had done work for the manufacturers of "Metal-Life," testified that the iron carbonyl it contained is insoluble in water and if taken in the stomach, would not prove fatal but would be expelled by vomiting; that before carbon monoxide would form, the "Metal-Life" had to be heated to about 220 degrees.

Neither Dr. Goodloe nor Dr. Grossman thought the hyoid was fractured by a fall (although they testified such a thing was possible), but both were of the opinion that it would take strong pressure on the neck to break this bone. Dr. Goodloe gave as his opinion that the girl died from shock, which was the result of bruised blood getting into the circulation and causing a tissue traumatism, but he admitted that shock could be produced by emotion or excitement. Dr. Grossman gave as his opinion that her death was caused by strangulation from a ruptured blood vessel rather than by choking.

The rule in this jurisdiction is that while a conviction may be had on circumstantial evidence, such evidence must be stronger than a mere suspicion, and if the evidence relied upon for a conviction is as consistent with the innocence of the accused as with his guilt, it is insufficient to sustain a conviction. Pardue v. Com., 227 Ky. 205, 12 S. W. 2d 288; Tarkaney v. Com., 240 Ky. 790, 43 S. W. 2d 34, 39; Hawk v. Com., 284 Ky. 217, 144 S. W. 2d 496, 498; Fyffe v. Com., 301 Ky. 165, 190 S. W. 2d 674, and the many authorities cited in these opinions.

The only reason to fasten Juanita's death on appellant is that he admitted slapping or hitting her in the face and choking her with a necktie on May 14th, before she died on May 21st. She never complained to a soul of this mistreatment by him and his testimony was that the striking and choking he administered to the woman was so slight that it would not have injured a two year old child. Juanita not only told appellant and Dr. Overby, the first physician who saw her, and Ann Grant that she had taken poison, but she told Miss Powers and Mrs. McCann that her face, eyes and neck were discolored as a result of an attack upon her by a drunken man in the restaurant where she worked, which attack was before appellant ever struck or choked her as she appeared in his room with blacked eyes. She further told Dr. Goodloe and policeman Molloy she hurt herself by falling against the bathtub.

Certainly, in the face of this evidence and of the medical testimony, the jury should not be allowed to speculate or guess that her death was the result of the slight chastisement which appellant inflicted upon her eight days prior to her death and to say that he should be punished. The most that can be said for the evidence produced by the Commonwealth is that it is as consistent with appellant's innocence as with his guilt, and, under the rule just stated, it was the duty of the court to peremptorily instruct the jury to acquit him.

The judgment is reversed for proceedings consistent herewith.