## Sayler v. Commonwealth.

(Decided May 5, 1936.)

54

WILLIAMS & ALLEN for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for the Commonwealth.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Reversing.

Tom Sayler has been sentenced to 21 years' imprisonment for voluntary manslaughter under an indictment charging him with the murder of his father, Jim Sayler.

By this appeal he is seeking a reversal on grounds (1) that the verdict is palpably and flagrantly against the evidence, and (2) misconduct of one of the jurors in failing to disclose on voir dire examination that he had both formed and expressed an opinion as to the guilt of accused and entertained bias and prejudice against him.

Appellant and deceased were tenants on the farm of Leonard Wyatt near Elkatawa in Breathitt county and lived together on the farm, the family consisting of deceased and his wife, and appellant and his two children. The killing occurred on June 29, 1935. It appears in evidence that deceased left home in the morning and returned a little before noon intoxicated and in a very ugly frame of mind. Shortly after his return, deceased, appellant, Sam Whitley, and Seldon Overbee, two neighbors who had come over for a visit, were on the front porch, and deceased was insisting on trading shoes with Whitley, but the latter was protesting that he did not want to make the exchange. Appellant said,

"Pa, I don't believe I would try to trade with the boy against his judgment," and this interference upon the part of appellant seemed to anger his father. Later a horse which deceased had borrowed from a neighbor and had tied to a tree got loose. Appellant, Whitley, and Overbee walked down that way, appellant caught the horse and was tying it to a limb, when deceased followed and again began quarreling with him. Appellant suggested that if his father would quit quarreling, he would go put on his shoes and leave, which he did, his father following him with an open knife. To make his escape, appellant had to wade the creek, but before doing so, threw a rock or two toward his father. In the meantime, Mrs. Sayler, having heard the threats and deceased saying he would go back and get his pistol, had her granddaughter take deceased's pistol from a dresser drawer where it was kept and hide it. When he returned to the house he asked for the key, and after unlocking the drawer apparently made a search for his pistol. About this time appellant returned, and deceased discovered him, and with his knife still in his hand was breathing out threats, but as the yard fence was between them he could not get to appellant. Deceased then returned to the house, where he fell asleep on the floor, and some of the family called to appellant to return, which he did, thinking that his father would sleep off the intoxication and be in a better humor when he awakened. When deceased awoke he immediately renewed hostilities and told appellant he had not forgotten what he did to him the day before. He started back through the house, slapped Mrs. Sayler once or twice and told her to get his pistol. He then procured a piece of board and had drawn it back as if to strike her when his son interferred, threw him to the floor and took the board from him. They decided to tie him with a rope but upon his protest that he would do nothing more, let him up. He then put on his shoes and started away, saying he would procure a pistol and kill every one of them. He went to Elkatawa and the family were evidently afraid he would carry out his threat, since Mrs. Sayler and one of appellant's daughters left and went some distance away into a field. Appellant and Leonard Wyatt had started toward the home of the latter when another daughter of appellant called to him to return and get some laun-

dry which she had done for a neighbor. About the time he returned to the house and got the basket of laundry, his daughter saw deceased returning with a pistol and told appellant to run, which he did, going to the home of Leonard Wyatt. He was followed by his father, who fired one or two shots at him as he neared the house. Appellant ran into the house, and, according to his testimony, procured a shotgun, ran to the door, and told his father not to come on up; that he did not want to hurt him, but his father shot at him again and he returned the fire. Deceased fired two more shots and then started away, but walked only a short distance and fell dead.

The evidence shows that a number of shot struck deceased about the face, neck, and chest and one witness testified that he discovered a hole in the upper lip into which he inserted his little finger, and which apparently was made by a pistol or rifle ball, but another who saw it stated that it might have been made by a bunch of shot. Deceased's family as well as a number of neighbors testified that, when drinking, he was overbearing, dangerous, and violent, and there is evidence of numerous threats made against appellant. There is also evidence of threats made by appellant toward his father. There is proof that deceased had often, when drinking, been quarrelsome with his son, and had followed him in a threatening manner, and most if not all of the threats of the son testified to, concerned statements as to what he would do if his father did not cease following and threatening him.

In our resume of the evidence we have purposely refrained from a recital of the profane, harsh, and threatening language deceased used toward his son and other members of his family. There is no evidence whatever of any act or conduct upon the part of appellant to provoke the anger or murderous attack of his father.

The foregoing facts are established, not only by the evidence of appellant, his mother and children, but by Mr. Wyatt and other apparently disinterested witnesses. In a brief filed on behalf of the commonwealth, the writer makes a commendably clear-cut and straightforward recital of the facts and finds only evidence of

the hole in deceased's lip as indicating that a pistol or rifle might also have been used by appellant, and evidence of previous threats and subsequent conduct of appellant to sustain the verdict. The evidence of subsequent conduct consists of a statement of a witness that appellant told him after the tragedy to get the pistol from deceased and appellant's manner in handling the shotgun at the time was such as to make him afraid not to comply with the command. There is also evidence that appellant had formerly been convicted of a felony.

Presumption of innocence attaches to one arraigned for crime until it has been legally determined otherwise, and this presumption can only be overborne by evidence of a substantive and probative character. It has often been held in this jurisdiction that where the evidence offered by the commonwealth is as consistent with innocence as it is with guilt, a conviction should not be sustained. Marcum v. Commonwealth, 212 Ky. 212, 278 S. W. 611; McCall v. Commonwealth, 210 Ky. 336, 275 S. W. 807; Couch v. Commonwealth, 255 Ky. 729, 75 S. W. (2d) 360. It is quite obvious that there is no direct evidence to sustain a conviction on the charge in the indictment or upon which to base a reasonable inference of guilt, and a conviction cannot be sustained on mere suspicion or conjecture. Fuson v. Commonwealth, 230 Ky. 761, 20 S. W. (2d) 742; Davis v. Commonwealth, 211 Ky. 771, 278 S. W. 104; York v. Commonwealth, 235 Ky. 751, 32 S. W. (2d) 331; Schuster v. Commonwealth, 240 Ky. 785, 43 S. W. (2d) 41. Evidence of the criminal record of appellant, coupled with suspicion, conjecture, or inferences having no foundation in fact, are not sufficient. A careful consideration of the record as a whole leads inevitably to the conclusion that there was nothing of substance on which to base the verdict, but that it was the result of evidence of appellant's former conviction and the natural revulsion in the minds and hearts of men against patricide. The law, however, makes no exception to the right of self-defense because of ties of blood or relationship. This court is not authorized to and it has consistently refrained from usurping the authority of juries as triers of facts. The power to hold a verdict against the evidence has always been exercised

with caution, but where the verdict is flagrantly against the evidence, or is not sustained by any evidence, it is the imperative duty of the appellate court to so hold.

Appellant's contention that the verdict is flagrantly against the evidence is fully sustained, and not only so, but we conclude that the court should have granted his request for a peremptory instruction at the close of the evidence offered by the commonwealth; and this conclusion renders it unnecessary to discuss the second ground urged for reversal.

Judgment reversed, and cause remanded·for proceedings consistent with this opinion.