## Wagoner v. Commonwealth.

Jan. 30, 1940.

J. Milton Luker for appellant.

Hubert Meredith, Attorney General, W. Owen Keller, Assistant Attorney General, J. B. Johnson and H. H. Owens for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The appeal is by Virgil Wagoner from a conviction of the murder of Albert Mahan on October 29, 1938, and a sentence of life imprisonment. The appellant's principal ground for a reversal of the judgment is that he was entitled to a peremptory instruction to be found not guilty.

James Mahan, lived on Moore Hill, a suburb of Corbin. Another railroad pensioner, Add Gillis, and his son, Albert Mahan, lived with him. Close by Ben Salmon lived with his father, who was the father-in-law of the appellant, who lived a mile or so away. On this Saturday afternoon, Wagoner had brought his family over to Salmon's home. The deceased, Albert Mahan, the appellant, Wagoner, and his brother-in-law, Ben Salmon, were intimate friends, there never having been any trouble among them. In the late afternoon Salmon and Wagoner were in the road in front of the Mahan house when James Mahan came along. Salmon was playing with a pistol which he said was not loaded. He wanted to pawn a watch to James Mahan for $2.50 and also suggested pawning his pistol for $10. It appears that at this time Albert Mahan had left the party for a few minutes. The father went into the house and after an hour or so the three younger men went in. They, with Add Gillis, sat around awhile talking. The three younger men were drinking, but there is no evidence that any of them were drunk at this time. Albert Mahan and Ben Salmon went out the door. In two or three minutes a pistol shot on the porch was heard. The father, James Mahan, opened the door and told the boys not to shoot around there any more. The appellant was in the house with the father and Gillis when this occurred. No argument or scuffle was heard. A few minutes later the appellant left the room. The father and Gillis testified that it was from five to seven min-

utes afterward that they heard a second shot fired out to the side of the house. Mrs. Everett Farmer, a next door neighbor, testified that after the first shot there were two men on the Mahan porch, one of whom she recognized by his voice as being Ben Salmon. In a minute or so somebody came out the door and said: ''What's the matter, Buddy; are you trying to kill me too?'' Salmon laughed and said: ''No, I am not trying to kill you.'' They talked in a low voice, started toward the gate and fell in the rose bushes. The three men went out the gate and about twenty minutes later she heard the second shot. K. E. Mahan, a cousin of the deceased, was in the road a short distance away when he heard the shot on the porch and a bullet whizzed by him. He ran into a store. A few minutes later he heard a second shot above Mahan's house.

The next morning James Mahan, the father, found his son's hat and a little puddle of blood on the porch. He went about making inquiry for his son. It appears that the sheriff had been notified, for when the old man got back home the sheriff told him, as he testified, that Albert's body had been found. It was about 100 yards from the house. The route to the place was out Mahan's gate, thence down the road about 40 yards, and then back in a lot. A witness testified to the condition of the body when found. There were two bullet holes in his head an inch or so apart. One was near the right temple and the other back toward the ear. He turned the body over and, seeing a hole in the ground, dug out a .45 bullet which had passed through the man's head. This had been fired while the body was prone on the ground. The sheriff testified that while he had the appellant in custody, on Wednesday following, he told the officer that Ben Salmon, at the point of a pistol, had made him help carry Albert's body part of the way from the house to where it was found; that after they had laid it down Salmon told him to ''get gone'' and not to look back; that if he ever heard of him mentioning it he would kill him.

A neighborhood merchant related that on the afternoon the deceased had tried to sell him his boots and the merchant had let him have $1.75, with the understanding that he could redeem his boots whenever he wanted to. The father testified that his son had a dollar bill and a fifty cent piece that afternoon. No money was found on the body.

The Commonwealth here rested its case and the defendant moved for a directed verdict of acquittal, but his motion was overruled.

The defendant's story is the same as that of the Commonwealth, namely, that when the first shot was fired he was in the house with the deceased's father and Gillis. When he first went out the door he did not see anyone, the night being dark. When he got to the gate Mahan was lying on his back in the road with Salmon standing by him with his pistol in his hand. When he asked Salmon what had happened he replied: "I have killed this damn fool," and drew the pistol on Wagoner. When he started back to tell the father, Salmon cursed him and declared: "If you move or cheep or open your mouth I will pile you across him." Since Mahan's body did not move Wagoner believed that he was dead. Salmon requested him to help him carry the body. He, Wagoner, let on like he had stumped his toe and fell. This corresponds with Mrs. Farmer's testimony, except that she said three men went out the gate and fell. Wagoner begged Salmon not to get him into trouble, but he was forced to continue to carry the body. They laid it down at the place where it was found and Salmon told him to go home and get started quick. He threatened to kill him if he should tell what he had seen. Wagoner left hurriedly and when he had gone some distance he heard a shot fired back where he had left Salmon and Mahan's body. He went home and kept watch during the night for Salmon's approach. The next day he hid out in the mountains. During that night he went to the home of another brother-in-law some distance away, on Richland creek, in Knox County, reaching there before daylight. He told him what had happened and asked him to go after the sheriff. He did so and Wagoner was arrested.

Thus the case stands with no contradiction on any material point. The Commonwealth established no motive. On the contrary it proved a close friendship among all the parties. It proved that the defendant was not present when the first shot was fired into the man's head on the porch where blood was found the next morning. That bullet had passed through his head, for it whizzed by K. E. Mahan in the road. There is no specific proof as to the effect of the shot, but everyone knows that such a wound by a .45 caliber bullet is ordinarily immediately fatal. The firing of the second shot

through the man's head while he lay on the ground and without having moved sustains the defendant's theory that at that time he was already dead. There is no sort of contradiction that Wagoner did not have a pistol. The record discloses that Salmon had pleaded guilty of the murder.

The court included in the instructions a predicate for finding the defendant guilty if he fired the second shot and that it hastened the death of the wounded man. That could have been the only basis of guilt, and yet there is no proof that the man was merely wounded. There is proof undenied that he was already dead. True, the defendant fled, and the Biblical proverb is often paraphrased to read, ''The guilty flee when no man pursueth.'' But in this instance the defendant believed and had reasonable grounds to believe that a man whom he knew had killed another might pursue him. So the flight was not inconsistent with innocence.

If there is any evidence conducing to show that the defendant is guilty of the offense charged or any of its degrees, the question of guilt or innocence must be submitted to the jury as one of fact; but if the evidence fails to incriminate the defendant, or establish guilt in any respect, though it may tend to create a suspicion of guilt, it is a question to be decided by the court as one of law. It is, then, not only the right but the duty of the Judge to instruct the jury to return a verdict of not guilty. Noah v. Commonwealth, 273 Ky. 272, 116 S. W. (2d) 315. It is seldom that the evidence justifies the exercise of this authority, but we have a number of cases in which the study of the evidence has led to the conclusion that justice demanded that the trial court should have directed a verdict of acquittal. Among them are Sayler v. Commonwealth, 264 Ky. 53, 94 S. W. (2d) 281; Marcum v. Commonwealth, 212 Ky. 212, 278 S. W. 611; Helton v. Commonwealth, 242 Ky. 386, 46 S. W. (2d) 487.

The conviction of the appellant must have been the result of prejudice or reaction to proof of what was apparently a cold-blooded murder. Certainly, the conviction was based upon something foreign to the record, for we are clearly of the opinion that it does not tend to establish the appellant's guilt. Therefore, the court should have directed a verdict of acquittal.

Judgment reversed.