## Fyffe v. Commonwealth.

Oct. 26, 1945.

166

Diederich & Lycan and A. W. Mann for appellant.

Eldon S. Dummit, Attorney General, and M. J. Sternberg, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The tragic death of Ida Mason is clothed in mystery. For it her first cousin, Matther Fyffe, has been convicted of murder and sentenced to imprisonment for life. He appeals to this court for a reversal of the judgment upon the ground that the evidence fails to establish either the corpus delicti or his connection in any way with the death.

U. S. Highway No. 60 parallels the C. & O. Railroad between Morehead and Ashland. About two miles east

of Morehead, at a place called Rodburn, State Highway No. 32 leads off to the south to Sandy Hook and beyond. It crosses the railroad about 250 feet away. Soon after 10 o'clock of the night of February 22, 1943, perhaps within fifteen minutes after a fast train had passed going east, the body of Ida Mason was found in the road 4 to 6 feet from the south rail. Van Caskey, a taxi driver, testified that as he approached the crossing he saw two young men getting out of a red Chevrolet automobile north of the track, and seeing that something was wrong he got out of his car and they found the body of the woman. One of these young men was Raymond Turner, a soldier, who it seems lived in the neighborhood and was at home on furlough. The other one was not identified in the record, and Turner did not testify. The absence of these witnesses is not accounted for. Caskey immediately returned to Morehead and notified the police authorities. A large crowd soon gathered at the scene.

The body was lying at an angle to the railroad track nearer the east side of the road than the west. The woman's dress was rolled up under her arms and over and around her head. One of her shoes was found by the cattle guard on the west and the other one about 20 feet southeast of the body. The next morning the woman's wrist watch, with a metal link band, as well as the watch itself torn apart, was found 30 feet or more beyond the shoe and in the same southeasterly line. A lady's handkerchief was picked up on the track about 15 feet east of the crossing the next day. Her suitcase and purse were also found the next morning on the north side of the railroad near the fence of the cattle guard. Several witnesses who had searched the scene that night in the lights of automobiles were positive they were not there then.

The body was mangled. The woman's nose and left cheekbone had been broken and crushed. Her skull was fractured at the base of the brain and also over the left eye where there was a two inch cut. There was a deep cut on her forehead and two others on the side of her head. Both arms were broken, the bones of one of them protruding from the flesh. Her left wrist was torn about where a watch is usually worn. Her upper teeth were missing. Her body bore several bruises and "burnt" places, indicating that it had been dragged or

had skidded on a rough surface such as the road. There was fresh blood beneath the woman's head, and at the time of the discovery some was oozing out of her ear. The body appeared to be warm and had not stiffened. Blood was not found at any other place at the scene.

To negative the idea that the deceased had been struck or killed by the train, which had passed a few minutes before, the Commonwealth introduced the enginemen who testified that they were maintaining a lookout as they passed over this crossing and had not seen the woman or anyone else there. Railroad employees at Ashland testified there was no blood or other substance on the engine that would indicate a person had been struck by it. Lewis Branham, who lived in a house owned by the Sheriff of Rowan County, situated about a half mile south of the railroad crossing, testified that around 9:30 o'clock he heard a car door slam out in front and went to his door. A gray "tannish" automobile was moving away slowly toward the railroad. He heard what he thought were three groans, like someone in distress. His daughter gives the same evidence, adding that it was a Chevrolet automobile.

The deceased, who was 33 years of age, was born and reared in the vicinity of Isonville, in Elliott County, about 8 miles southeast of Sandy Hook. After her brothers and sisters had married and moved away, she remained at home with her mother until she went to work in Cincinnati in July, 1942. From then until her death she lived in Covington, commuting to her work. On several occasions Miss Mason had registered and taken a room at the Ventura Hotel in Ashland around 3 o'clock, which is shortly after a train from Cincinnati arrives. She would check out of this room after a few hours, or around 4:30 or 5 o'clock. The records of the hotel show that she did this on January 9th and 31st, and also on the afternoon of February 22nd, the day she met her death. The clerks say that she had no telephone calls and, so far as they knew, no callers. The station from which buses run to Morehead is located in or near the hotel.

The evidence which the Commonwealth maintains connects the defendant with the death of the woman is to be measured against the background. Their mothers were sisters. They had lived all their lives in the

community and their families had always been intimate and friendly. The appellant has a wife and six children. From 1933 until 1942 he was supervisor for the Works Progress Administration (WPA) in Elliott County. The deceased worked under him as a traveling librarian and on sewing projects. She and others had usually ridden with him between Isonville and Sandy Hook. About the time Miss Mason left to work in Cincinnati, in July, 1942, Fyffe went to work at Richmond, Ky. In November, 1942, he got a job with a large war defense industry located at South Point, Ohio, which is on the river across from and above Ashland, 6 or 8 miles distant. He boarded with Mrs. Grace Hayes, in Ashland, on Winchester Avenue, near 23rd Street. His family and hers remained in Elliott County, except that his wife had been working two or three months in a defense plant in Dayton, Ohio.

Miss Mason had expected to give up her job and go home about Easter to live and take care of her mother. On February 15th, a week before she was killed, she had gone from Covington to Lexington, thence to Morehead by bus. Two acquaintances on the bus testified that it reached Morehead, where the three got off, about 3 o'clock in the morning. They went up in town and saw nothing more of Miss Mason until she boarded the bus going to Sandy Hook near Rodburn, where, as we have stated, the road to that town turns off near the railroad crossing. This was about 6 o'clock and before day break. A brother of the deceased, on his cross-examination, testified that she had told him that the bus had come in early and it was cold and she thought she would walk to Rodburn and catch the bus there, but it had come along before she had reached that point.

The only evidence of any substantiality whatsoever tending to connect the defendant with the death relates to (1) motive, (2) his talking with her on a street in Ashland, 60 miles away and five hours before her body was found, and (3) his being with her and another woman and man near the crossing three hours before.

1. In March, 1942, while both parties were working together in Elliott County, as described, at the solicitation of an agent of the Commonwealth Life Insurance Company, she took out insurance on her life for $5,000, in which she named Fyffe as beneficiary. The

agent testified she told him that her mother was old, she had no brother or sister and that her cousin "lived close by and took care of their business." But the form she filled out lists her brothers and sisters. Although she had applied for a policy with double indemnity in case of accidental death, that provision was omitted from it. In November, 1942, she was solicited by an agent of the Metropolitan Life Insurance Company in Covington. She wanted an accident policy, but for some reason the agent stated he could not write it for her. He did take her application for a life policy for $5,000 with double indemnity for accidental death, and it was issued in due course. When the agent raised some question about naming her cousin as beneficiary, Miss Mason insisted on it, saying that he "practically raised me; therefore, I want to make him beneficiary." About the same time Miss Mason looked up another agent for the Commonwealth Life Insurance Company in Morehead and made application for another $5,000 policy, with Fyffe as beneficiary. The company rejected the application and the policy was not issued.

In both of the policies which were issued the right of the insured to change the beneficiary was reserved. They had been sent to Fyffe by Miss Mason through the mail. He denied having previously known of her taking out the insurance and testified that he had nothing whatsoever to do with obtaining them. The proof is that Miss Mason herself paid the premiums quarterly. Fyffe testified that she had told him that he had done more for her than anybody else and that if anything should happen to her she would rather for him to have her insurance than anyone else; that she felt like he would do more or as much for her mother as anybody else would do. He had loaned her money from time to time, but most of it had been repaid after the policies were issued. Miss Mason had once talked with Mrs. Fyffe about her insurance and said she had made him her beneficiary because he had loaned her money and had helped her more than anyone else.

Fyffe also related that about a month before her death (the last time he saw her) he had accidentally met up with her one night about 9 o'clock in the railway station at Ashland, and she had ridden with him to the bus station, three or four squares away. She had previously sent him another policy for $1,000 in which he was the

beneficiary, but he had returned it to her, with the advice that it was not worth much. On this ocasion he told her that the policy did not mean anything for her as none of it was payable until her death; while she could get back part of her money on the others after she had carried them a few years. At his suggestion, she had changed the policy and had named her mother as beneficiary.

2. Without doubt, on the afternoon of February 22nd, Miss Mason left Covington and went to Ashland on the train, reaching there about 3 o'clock, and promptly procured a room at the Ventura Hotel. She was alone; remained in her room, and had no callers. When she checked out about 4 o'clock, she seemed to be in a great hurry. An automobile was out front with the horn blowing. The hotel clerk testified also that he "naturally thought somebody was calling for her." Further: "I thought I saw her talking to some man [on the outside]; I couldn't swear to that; I don't remember." When asked to look at the defendant, the witness stated he did not remember ever having seen him.

Arthur Cope, an employee of a steel mill in the western part of Ashland, testified that he left there around 4:30 o'clock that afternoon in his automobile, drove down Winchester Avenue, 3 or 4 miles distant, and saw Fyffe, whom he knew, standing on the corner by the Ventura Hotel and the bus station, talking with a woman whom he did not know. They were on the sidewalk where passengers boarding the city buses were standing. The witness testified the woman was heavy and wore a black coat with a fur collar and black hat. By her side was a small grey or brown grip with a stripe around it. When shown a photograph of Miss Mason the witness stated that it looked like her but "I couldn't swear it was her; I don't know; it does look like the lady I saw." He definitely fixed the time as being between 4:30 and 5 o'clock.

There is effective countervailing evidence. The record of the company for which Fyffe worked at South Point, Ohio, 6 miles or more away, showed that he checked out there at 4:30 that afternoon. He, Cleve Clevenger, his superior engineer, and Victor Hallard, another member of the same crew, testified that they, with John Blevins, rode with Fyffe to Ashland. Cleveng-

er and Blevins got out at the end of the bridge at 12th Street and Winchester Avenue, one block west of the Ventura Hotel, probably at 5 o'clock. The car drove on eastwardly and Hallard got out near 17th Street (according to him and Fyffe), which is three or four blocks east of the Ventura Hotel. Fyffe testified that he drove straight to his boarding house about six squares farther east, ate his supper and stayed there until about 7 o'clock. He was corroborated in this by his landlady, Mrs. Hayes.

3. The strongest testimony against the defendant is that of Ray Wright, that about 7 o'clock the night of Miss Mason's death, which was after dark, as he drove by on his way to Sandy Hook, he saw her, Fyffe and another man and woman in front of a parked tan Chevrolet automobile, on Highway No. 32, just off of Highway No. 60, and about 200 feet from the railroad crossing. He had known Miss Mason and Fyffe a number of years. She had on a dark coat with a fur collar. He could not describe her hat nor tell how the other woman or either man was dressed. Later during the course of his examination, the witness stated "I took it to be him," meaning Fyffe.

This witness was impeached in every way permissible. (a) He had been convicted of a felony. (b) He bears a bad general reputation. (c) He had testified to having bought some automobile parts for his brother living at Sandy Hook from a certain garage in Morehead just before he started out on this trip. The sales ticket for them, however, was dated the 21st, the day before. He had spent the night of the 21st with his brothers in Sandy Hook. In rebuttal, he insisted that the date on the sales ticket was wrong. (d) He had previously given a statement to an attorney, representing one of the insurance companies, in which he had identified a Miss Whitaker as being the other woman present at the car, and said that she was wearing a "swagger" suit. It was clearly and definitely proven that this woman was working in Philadelphia at the time. She had once lived in the neighborhood and did own a "swagger" suit, but she was certainly not in Kentucky on that day. On the trial Wright denied ever having named this woman, but all the proof is to the contrary. (e) Although he testified that he had known Fyffe for nine years, he had told his former partner that he did not know him. (f) Finally,

the witness had no idea how anyone found out about what he knew about the case, insisting that he had never told anyone until two detectives had come to interview him. This, it is true, is ordinarily of little significance, especially with a timid witness, but when coupled with evidence of impeachment it bears some indication of embarrassment, for it is an evasion or unnecessary affirmance of innocence and disinterestedness. Why should he not have revealed to whom he first told what he had seen when it was so important evidence in a mystery that was receiving wide publicity?

Over against Wright's testimony is that of the defendant, Fyffe, and its corroboration. He related that after supper at his boarding house he had gone into the business district about 7 o'clock, got some gasoline at a certain station, parked his car in front of the post office, and then went to a picture theater across the street. His landlady says he left the house soon after supper. His brother-in-law, Wm. Isom, testified he had seen him in the theater. He came out and went to a drug store for a soft drink before driving to his boarding house for the night. Pierce Brown saw him about 10 o'clock coming out of the theater and going in the direction of the drug store and called to him that it was about his bedtime. Mrs. Hayes testified he came in sometime between 9 and 10 o'clock, sat awhile before the grate talking with her and a boy. She remembers this particularly because when she suggested that they get some ice cream, a woman washing dishes in the kitchen called attention to the fact that the stores had closed. He went to his room, and the landlady is positive he did not leave that night, and was at breakfast at the usual time the next morning. Clevenger says he came by for him there that morning about half past seven to go to work together at 8 o'clock.

The defendant established by several witnesses that he bore a good reputation generally, and this was not challenged.

Some significance is attached to the fact that Fyffe did not attend his cousin's funeral. He explained that it was difficult to get away from work at the war plant. Also, after he was put under suspicion that he declined to yield to the suggestion that he go to Elliott County and have a talk with Miss Mason's brothers.

It will be readily observed from the very full state-

ment of the evidence that it is lacking in positive proof either of the corpus delicti, i. e., that the woman came to her death by criminal violence, or of the defendant's connection with her death. We hold that positive proof, such as was introduced by the defendant to establish his innocence, may be overcome by circumstantial evidence, although uncontradicted and unequivocal positive testimony of disinterested and unimpeached witnesses may not be arbitrarily disregarded. Commonwealth Life Insurance Company v. Pendleton, 231 Ky. 591, 21 S. W. 2d 985, 60 A. L. R. 1526.

The character and extent of the wounds on the body of the woman, the condition of her clothing, and the location of her shoes and watch raise a very strong inference that she had been struck by the train which had passed over the crossing a few minutes before. It would be very unusual for one who may have killed her to inflict all of the wounds or so to scatter her effects. The theory of the Commonwealth does not seem to be that her dead body was placed on the track and then struck by the train. The burden was upon the Commonwealth to establish the corpus delicti beyond a reasonable doubt, and it was not upon the accused person to explain any doubtful fact. It was not upon the defendant to show how the woman happened to be in the locality at the time of the night. He did establish the fact that just one week before she had walked from Morehead to Rodburn before daylight and caught the Sandy Hook bus there, which afforded at least a guess that she might have done the same thing for that purpose on this night. It was not incumbent upon the defendant to explain how it was that one of her shoes was 20 feet southeast of the body and the other 20 feet west of it; nor to account for her suitcase being found the next morning. We have very grave doubt of the corpus delicti having been proven in this case, for circumstantial evidence which is as consistent with the absence of a crime as it is with its perpetration, or which may be reconciled with the presumption of innocence, is not sufficient to prove corpus delicti. Denham v. Commonwealth, 239 Ky. 771, 40 S. W. 2d 384; Hawk v. Commonwealth, 284 Ky. 217, 144 S. W. 2d 496; Walters v. Commonwealth, 291 Ky. 573, 578, 165 S. W. 2d 153. The evidence of a criminal agency having caused a death by violence was much stronger in Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. 2d.

34, and this court held it insufficient. But we pass by the question of the sufficiency of the proof of this fact, for we are of opinion that the evidence of the defendant's guilt was not sufficient as a matter of law to authorize the submission of the case to the jury. As said by the New York Court, In Matter of Case, reported in 214 N. Y. 199, at page 203, 108 N. E. 408, at page 409, "Insufficient evidence is, in the eye of the law, no evidence."

Let us refresh ourselves on the law and measure the evidence by it.

That the defendant was beneficiary in insurance policies to the amount of $15,000 in case of accidental death clearly provided a motive for him to have killed his cousin or caused her to be killed, although there is no contradiction of the evidence that she had personally procured the insurance and named him beneficiary for reasons which seemed satisfactory to herself. While motive is an important factual element in a prosecution for crime, obviously it is not sufficient in itself to convict anyone. Denham v. Commonwealth, supra; Means v. Commonwealth, 238 Ky. 366, 38 S. W. 2d 193; Gilpin v. Commonwealth, 297 Ky. 67, 178 S. W. 2d 964. It may be observed on this point that it was to the financial interest of the decedent's brothers, and perhaps of the insurance companies, that the defendant be convicted. The record shows that insurance company investigators and attorneys were active and the decedent's brothers were energetic in employing detectives and lawyers. It appears that before this trial the administrator of Miss Mason's estate had filed a suit to recover the insurance benefits and that the defendant had intervened also seeking to collect the money.

As stated, the evidence relied upon to convict the defendant, other than motive, was the testimony of Cope and the testimony of Wright, with the failure of the defendant to attend the funeral or to have a talk with the deceased's brothers after he was brought under suspicion. We regard the latter proof as of little significance.

As has been written many times, circumstantial evidence tending to establish guilt is not sufficient if it only creates a suspicion, or if it does not form a complete chain and point directly and unerringly to the guilt of the accused. Furthermore, if the evidence may be re-

conciled with the presumption of innocence, it must be done and it is the duty of the courts to give the reconciliation force and effect. Meyers v. Commonwealth, 194 Ky. 523, 240 S. W. 2d 71; Bullock v. Commonwealth, 249 Ky. 1, 60 S. W. 2d 108, 94 A. L. R. 407; Sayler v. Commonwealth, 264 Ky. 53, 94 S. W. 2d 281; Hawk v. Commonwealth, 284 Ky. 217, 144 S. W. 2d 496.

The testimony of both witnesses is identification. It is very easy indeed for anyone to be mistaken in identifying a person, particularly where the opportunity was not clear or the observation only casual. Cope was passing by on a crowded street and identified the man and woman standing among others on the sidewalk. Wright was passing by at night and identified them standing with two others by an automobile. Even he weakened and ended up by saying that he "took it be Fyffe." The perception or perspicacity of these two men by which they were able to describe the dress of the woman, especially that it had a fur collar, is indeed remarkable. Likewise, of Wright and Branham and his daughter in describing the color and make of the defendant's automobile. We distrust these casual identifications on vital points.

Cope is contradicted by the probabilities of time, for it is quite certain that he quit work at 4:30 and had 3 miles to drive to get to the hotel corner, while Fyffe and his three companions quit work at exactly the same hour and had 6 or 8 miles to travel. He is contradicted by the hotel clerk, who stated that the woman left the hotel at 4 o'clock and apparently got in an automobile waiting for her, and by Fyffe's three companions, to say nothing of the defendant himself. Even accepting Cope's testimony as a fact, is it not reconcilable with the defendant's innocence?

Wright is absolutely discredited. If it be accepted as a fact that he saw a tan Chevrolet automobile and the people as described, how much more weight should be given the fact than to the presence of Turner and the other man in his red Chevrolet, just before the discovery of the dead body? By no means are we to be regarded as implying any guilt to them, for we only compare the circumstances of their presence at the scene with the dead woman with the presence of Fyffe and another man with the live woman nearly three hours before.

In Fry v. Commonwealth, 259 Ky. 337, 82 S. W. 2d 431, there was positive identification of a man accused of the crime of armed robbery of a bank in the daytime, which resulted in his conviction. The identification was by two individual victims and two customers who happened in, all of whom had time, opportunity and purpose to observe the men closely, and by two others who saw the robbers leaving the bank. Also by two other men who were apparently robbed by the same man and his companion in the country within an hour afterward. Other persons at different stations along the road undertook to do so as being the men they saw in a passing automobile. Some of these witnesses were equivocal, saying "I think so," or "he resembles him." But the positive alibi of the defendant was so forceful and overwhelming that we held the verdict of his conviction to be flagrantly against the evidence.

In Davis v. Commonwealth, 290 Ky. 745, 162 S. W. 2d 778, the defendant had been convicted of uttering a forged check upon his identification by strangers who had seen him only once and who had no reason to observe him particularly or to remember his characteristics and personality. Against that evidence was the record of the presence of the defendant at the time in a soldier's home in Tennessee, supporting his testimony of an alibi. His judgment of conviction was reversed as being against the weight of the evidence.

Under our present practice where the court reaches the conclusion that a verdict is flagrantly against the evidence, we rule that there was not sufficient proof to have taken the case to the jury, since the scintilla rule has been abolished. Rogers v. Commonwealth, 289 Ky. 83, 158 S. W. 2d 144; Coots v. Commonwealth, 295 Ky. 637, 175 S. W. 2d 139.

In this case we have very slight proof to support an inference of corpus delicti, and nothing more than a suspicion that the defendant committed the presumed crime. A warning was sounded long ago that it is better for many guilty persons to go unpunished than that one innocent person should be punished. We are of opinion that the trial court should have directed a verdict of acquittal.

Wherefore the judgment is reversed.