## Fyffe v. Commonwealth.

June 20, 1947.
Rehearing denied November 21, 1947.

John J. Winn, Judge.

A. W. Mann, John T. Diederich, Chesley A. Lycan, J. M. McIntire and Harkan Power for appellant.

Eldon S. Dummit, Attorney General, Guy H. Herdman, Assistant Attorney General, Elige Hogge, County Attorney, J. A. Richards, Rupert Wilhoit, W. W. Jayne and B. S. Grannis for appellee.

OPINION OF THE COURT BY JUDGE DAWSON—Reversing.

This is a second appeal. A judgment of conviction of murder was reversed because the evidence of guilt was not sufficient to have submitted the case to the jury. Fyffe v. Commonwealth, 301 Ky. 165, 190 S. W. 2d 674, 675. The appellant was again convicted of murder at a trial held in November, 1946, by a jury from Fleming County. His appeal rests upon the grounds that the evidence was substantially the same, and under the law of the case he is entitled to a peremptory instruction of acquittal; if not, that the court erred in admitting certain incompetent evidence.

The mangled body of Ida Mason was found at a railroad crossing a few minutes after a fast train had passed, with her effects scattered about. The theory of the Commonwealth is that the defendant had killed her and created the conditions to make it appear that she had been killed by the train. We expressed doubt as to the corpus delicti having been established, but reversed the judgment because we were convinced it went no further than to afford a suspicion of the defendant's connection with the woman's death.

We have gone through this record with meticulous care and compared it with the former one, witness by witness. Most of those who testified on the former trial related the same facts without material differences. We note the additional evidence.

Raymond Turner, who first came upon the body, gave his testimony this time, but he added nothing new. There were some differences in the testimony as to the exact distance and location of the body from the railroad track. No two witnesses described Turner's automobile alike. This is not important except possibly to show the uncertainty of evidence of identification in passing or seeing an automobile at night, which character of proof as to the defendant's car assumed importance in the chain of circumstances.

Van Caskey, the taxi driver, who came upon the scene a few minutes after Turner, added to his former testimony that when he helped to move the body into the ambulance it felt cold and was "getting stiff." One or two others, including the undertaker, gave like evidence. It was developed that the weather was cold and the body was not moved or examined for an hour or two after discovery. The opinions of a doctor and undertaker were that partial rigor mortis to the degree described would set in within that period where the body is exposed to cold weather.

Fred Johnson, captain of the bell boys at the Ventura Hotel, a new witness, merely corroborated the clerks that the deceased, Ida Mason, checked out of the hotel between 4:00 and 4:30 o'clock that afternoon.

Arthur Cope again testified that he had seen the defendant and a woman answering the description of Ida Mason in front of the hotel between 4:30 and 5:00 o'clock. He added to his testimony that after leaving his place of work, about two miles away, at 4:00 o'clock, he had gone across the river to Coal Grove, Ohio, which, he stated, was three miles up the river, and got his child before he passed the hotel. Thus, he made up some of the discrepancy in time disclosed by almost conclusive proof of the defense that the defendant could not have been at that point before 5:30 o'clock.

A new witness, Mrs. William Waggoner, ran a store

at Elliottsville, 10 miles away. She testified that between 6:00 and 7:00 o'clock that night, or maybe a little later, when the moon was shining, a two-seated brown Chevrolet came to her place. Pat Ison, the sheriff of Elliott County, and a man who, according to her best judgment, was Matthew Fyffe, but whom she did not know, and a "fleshy lady, with dark hair" came in, leaving another man in the automobile. The woman bought some chewing gum. Asked whether this was the defendant, the witness answered: "I don't know for sure it was him; it looked to be the same man." The woman "looked to be the same person in the picture," Ida Mason. The party left in the direction of the Rodburn crossing and Morehead. This witness had been present "every time they had a trial" of the case, but she had not previously testified. She denied having gone before the grand jury. She was irascible and belligerent under cross-examination. In contradiction there was produced a statement of her testimony before the grand jury which she had signed. It reads: "I did not know Ida Mason and so far as I know never saw her during her lifetime. I have never told anyone that she was in my place of business on Monday, February 22, 1943." On a previous trial the attorneys for the Commonwealth had questioned her in the witness room, but did not put her on the stand. The then acting County Attorney, Lester Hogge, testified that during the interview he asked if Pat Ison, Matt Fyffe and Ida Mason were in her store that night and she said they were not. To this statement that he had heard she had said so, she replied she did not know how that ever got started.

Eddie Johnson, who worked at the store at the time and who knew Ison, testified positively that he and the other two persons were not there that night. Ison denied it and it was otherwise proved that he was at his home in Sandy Hook at the time. The defendant also denied being there. The reputation of the witness for truth and veracity was proved to be bad and no attempt was made to support it. It is to be noted that her identification of the defendant and the woman was qualified and not positive. Like so much other testimony of this kind in this case it can be given no credence.

Ray Wright again testified to having seen the defendant, the deceased and another man and woman at

the intersection of the Sandy Hook road at Rodburn that night. This time he explained that his conviction of a felony was for child desertion, and the judgment had been suspended. For the first time evidence was introduced that he bore a good reputation.

On this trial Robert Staton testified that in the latter part of February, 1943, a man whom he did not know but whom he described as having on working clothes and "of medium, stocky build and black curly hair," brought a 1941 four-door Chevrolet car to a filling station in Ashland where he was working and had it washed. The car was muddy inside and out. The man asked him to wash out a spot of blood about "the size of a grapefruit" in the center of the cushion on the right side of the front seat where a passenger would sit. He said that he had had a woman there who had been sick. The witness washed out the spot with "lighter fluid," and the man returned for the car in an hour or so. He did not think he had gotten all the blood off. The car had ordinary seat covers, such as are used in many cars of the same kind and description, but he observed "a small three-cornered tear in the seat cover of the back of the front seat." In the following November, during the examining trial of the accused in Morehead, the witness was taken around the court house by a brother of the deceased woman, but without his aid, he testified, he picked out the defendant's automobile as the one he had washed the previous February. He found the same kind of tear in the seat cover, but he observed no sign of the blood spot in the defendant's car at this time.

Again we are presented with a general identification far from being positive and brought into the case under suspicious circumstances. The most striking thing about this testimony is that the witness was not asked whether the defendant, who was then sitting before him, was the man who had brought the car to him to be washed. The attorneys for the prosecution must have known what he would have said if they had asked him. The presumption and deduction are that the witness could not identify the defendant.

Over the defendant's objection the court permitted the introduction of the following testimony. A brother of the deceased woman and a detective, who had been

on the case from the beginning, obtained possession of the front seat of the automobile formerly owned by the defendant and took it to Cincinnati and had it examined by a chemist. Before hearing this testimony, it was established that Fyffe had sold the car to Clevenger of Sandy Hook, in November or December, 1943. He sold it the same day to Fanning, of Morehead, who took off the seat covers and cleaned up the car and sold it after three or four days to Mastin, of Winchester, a dealer in used cars. He kept it a few days, during which the boys around his shop repaired and drove it. Mastin sold the car to Richardson, who operated a taxicab in Irvine. It was while Richardson owned the car that the seat was examined. This was in March, 1944. Each of these owners testified that no blood got in the car while he owned it so far as he knew. None of them had seen blood on the seat. The chemist, Frank I. Broeman, examined the upholstery and found evidence of blood "on the right hand side in approximately the middle of the right hand half of the seat. It was also on the back portion of the seat on the inside of the lining." This is the edge covered up by the back of the seat. The witness testified, "The amount of blood was very small. It was a very small area. I found the blood by covering a very large area of the cushion. I removed the blood from the cushion by washing it off" with a piece of absorbent cotton and distilled water. He opened up the seam, pulled the cover back and went underneath it. The quantity he found was "the equivalent of a drop or two of blood."

This evidence was incompetent. Wharton's Criminal Evidence, Sec. 998, says: "To render blood-stained objects admissible, the identity and unchanged condition of the same must be first established by the party offering them." It had been 13 months since the woman met her death. The car had passed through many hands and been used by many persons. The several owners were hardly in a position to know for sure that blood did not get on the seat while they had it. There is no assurance that the automobile seat from which the drop or two of blood, analyzed by the chemist and presented to him by a brother of the dead woman and a detective in his employ, was in the same condition that it was that fatal night, 13 months before. It may have gotten on

the seat even before that night, for Fyffe had bought the car second-hand some time before that and after it had been repaired following a wreck. There is no assurance that it did not get on the seat in some other way than that theorized or that the article had not been interfered or tampered with. A further consideration of incompetency, although by itself probably not sufficient to exclude the testimony, is that this was an ex parte examination and none of the elements were preserved, so there was no opportunity to test the efficiency of the expert or the truth of his report. He did not relate what his chemical analysis was. He did not testify even that it was human blood that he found. We think the evidence created too much uncertainty to be admissible. State v. Garrington, 11 S. D. 178, 76 N. W. 326; State v. McAnarney, 70 Kan. 679, 79 P. 137; State v. Ilgenfritz, 263 Mo. 615, 173 S. W. 1041. Evidence is incompetent on a ground like this because it does not prove anything.

There is left in the case the same record as on the previous appeal, supplemented only by indefinite testimony of Staton and the indefinite and impeached testimony of Mrs. Waggoner. We have, therefore, reached the conclusion again that the evidence was not sufficient to have submitted the case to the jury and is not sufficient to sustain the verdict of guilt.

Judgment reversed.